Peter D. GACHE, Plaintiff,

v.

**TOWN OF HARRISON, NEW YORK
and The Village of Harrison,
New York, Defendants.**

**No. 90 Civ. 5908 (GLG).**

United States District Court,
S.D. New York.

Feb. 9, 1993.

Sidley & Austin, New York City, for plaintiff by Donald Stever, Mark Rachlin, Steven D. Myers, of counsel.

Skadden, Arps, Slate, Meacher & Flom, Washington, DC (John A. Amodeo, Jerry Jackson, of counsel), Ronald Bianchi, Town Atty., Harrison, NY, Daniel A. Piloseno, White Plains, NY, for defendants.

## OPINION

GOETTEL, District Judge.

## I. FACTUAL BACKGROUND

The Town of Harrison, New York maintains a municipal garage on Barnes Lane in the Purchase area of Harrison. The garage is primarily used for storage of highway maintenance vehicles. Beginning around 1970, the Town began dumping waste materials (including brush, concrete, scrap metal and auto parts) into a landfill behind the garage. Since 1970 and until 1989, when the Town ceased its dumping activities, the landfill gradually spread onto property owned by plaintiff Peter Gache. From 1982 through 1989, the Town charged private third parties, including gardeners and landscapers, a fee to dump materials into the landfill located on plaintiff's land. The Town never sought permission to dump on plaintiff's property. Plaintiff has offered evidence showing that the landfill sits atop or adjacent to a stream.

In 1989, the Town closed access to the landfill and began using an alternative site for its waste disposal. This action was taken after plaintiff had served a notice of claim pursuant to § 50–e of New York General Municipal Law. The landfill allegedly occupies some 5.5 acres of plaintiff's property and reaches in some areas a height of over 20 feet. Plaintiff retained two environmental consulting firms to sample the landfill's soil, the air above it, and the water and sediments in surrounding streams and wetland areas. The sampling data was also analyzed by an environmental expert retained by the Town.

The Town's expert concluded that the landfill poses no threat to human health or the environment, even if the property were

developed for residential use. Reaching a contrary conclusion, plaintiff's expert recommended excavation of the landfill. Plaintiff alleges that the landfill has discharged lead and zinc into the stream and an underground fire is burning at the dump as evidenced by elevated groundwater temperatures.

In September 1990, plaintiff filed this action against the Town of Harrison and the Village of Harrison [1] alleging violations of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6972(a)(1)(A) and 6945(a) and the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607. Plaintiff also raises state claims of trespass, public and private nuisance, inverse condemnation, and zoning violations.

Before the court today are motions for partial summary judgment brought by the defendants Town of Harrison and the Village of Harrison (collectively the "Town") on plaintiff's RCRA claim, the injunctive relief requested under both environmental statutes, and certain response costs claimed by plaintiff. Defendant also seeks summary judgment on plaintiff's claims of trespass, nuisance, inverse condemnation, and zoning violations or in the alternative, an order in limine precluding plaintiff's expert from testifying on issues of valuation and psychological impact.

Plaintiff has cross-moved for partial summary judgment on defendants' affirmative defense of adverse possession. In response, defendants have moved to strike the exhibits to plaintiff's memorandum in opposition to their summary judgment motions.

## II. DISCUSSION

### A. Defendant Town's Motion For Partial Summary Judgment on the Environmental Claims

Turning to the substantive motions, defendants first argue that plaintiff's RCRA claim must be dismissed and excavation of the landfill denied because no evidence exists showing any threat to human health or the environment from the defunct landfill. Defendants also seek summary judgment on plaintiff's claims for remediation costs under RCRA and response costs under CERCLA.

■ To prevail on a motion for summary judgment, the moving party must demonstrate "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Only disputes over facts that might affect the outcome of the suit under the governing law will preclude the entry summary judgment. Further, the court's function is not to resolve disputed issues of fact but solely to determine if genuine issues of fact exist. Uncertainty regarding the truth of any alleged material fact will defeat a summary judgment motion. *United States v. One Tintoretto Painting*, 691 F.2d 603, 606 (2nd Cir.1982).

■ Summary judgment is appropriate when, after drawing all reasonable inferences in favor of the non-moving party and reading the record in a light most favorable to him, no reasonable trier of fact could find in favor of the non-moving party. *Murray v. National Broadcasting Co.*, 844 F.2d 988, 992 (2d Cir.), *cert. denied*, 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988).

### 1. RCRA Claim

Defendants contend that summary judgment is required for plaintiff's RCRA claim because plaintiff has offered no evidence that a continuing violation of RCRA exists. Since the Town's dumping ended in 1989 and no evidence of further dumping exists on the record, defendants claim that plaintiff has alleged only past violation, not

---

**1.** In 1975, the Harrison was reorganized as a coterminous Town and Village under New York State Municipal Law. One result is that the governing body holds powers as a Town Board and a Village Board of Trustees over issues of taxation, state and federal aid requests, and land use regulation. Therefore, the Town and Village of Harrison are treated as a single entity in the present action.

actionable under section 7002(a)(1)(A) of RCRA, 42 U.S.C. § 6972(a)(1). Plaintiff contends that whether the Town's violation of RCRA is ongoing is a question of fact which precludes summary judgment.

Section 7002(a)(1)(A) of RCRA permits citizens suits against any person "who is alleged to be in violation of any permit, standard, regulation, condition, requirement, or order which has become effective pursuant to [RCRA]." 42 U.S.C. § 6972(a)(1)(A). The section continues by saying that "[a]ny action under paragraph (a)(1) of this subsection shall be brought in the district court for the district *in which the alleged violation occurred.*" *Id.* (emphasis added).

▪ Under the plain meaning of the statute, the continued presence of illegally dumped waste could constitute being "in violation" of a RCRA regulation or standard. The second quoted passage from (a)(1), stated in the past tense, clearly implies violations that have already occurred. Congress could have easily constructed this provision to rule out materials already discharged as a continuing violation by using a phrase such as "in which the alleged violation is occurring." Reading these provisions of (a)(1) together so as not to render the section contradictory, we conclude, as other courts have, that improperly discharged wastes which continue to exist unremediated represent a continuing violation of RCRA.

The crux of the Town's position is that because it has not dumped any materials after 1989, nor has plaintiff shown evidence of harmful wastes seeping out of the landfill, only past violations of RCRA can exist.

To support its position, the Town, citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), argues that no present RCRA violation can exist since the Town no longer dumps into the landfill. We think this argument overstates the *Gwaltney* holding. In *Gwaltney,* a citizens group sought civil penalties for past discharges in violation of a NPDES permit, discharges which had entirely ceased. The Court held that a citizens suit could only be brought where an ongoing violation existed.

▪ The Town argues, and we do not disagree, that wholly past violations of RCRA cannot be subject to citizens suits under § 7002 of RCRA. *See Chartrand v. Chrysler Corp.,* 785 F.Supp. 666, 669–70 (E.D.Mich.1992); *Lutz v. Chromatex, Inc.,* 718 F.Supp. 413, 424 (M.D.Pa.1989). However, the Supreme Court in *Gwaltney* did not detail what sort of actions could constitute a continuing violation. The focal question becomes whether defendants' alleged violations of RCRA should be considered wholly past violations.

Defendants focus on the act of dumping in assessing whether a continuing violation of RCRA exists. The Town argues that all dumping activities ceased in 1989 and have not been resumed since. We reject this contention as an overly narrow view of the violation that occurred. The continued presence of illegally dumped materials on plaintiff's property could constitute a continuing violation of RCRA. The environmental harms do not stem from the act of dumping when waste materials slide off the dump truck but rather after they land and begin to seep into the ground, contaminating soil and water. So long as wastes remain in the landfill threatening to leach into the surrounding soil and water, a continuing violation surely may exist.

Other courts have held that a claim of an ongoing violation need not rest on the occurrence of discharges around or after the filing of a lawsuit. *See, e.g., North Carolina Wildlife Federation v. Woodbury,* 1989 WL 106517, 1989 U.S. Dist. LEXIS 13915, 29 E.R.C. (BNA) 1941 (E.D.N.C. 1989); *Fallowfield Development Corp. v. Strunk,* 1990 WL 52745, 1990 U.S. Dist. LEXIS 4820 (E.D.Pa.1990). In particular, the court in *North Carolina Wildlife* held:

> Plaintiffs have clearly alleged continuing violations up to the filing of the complaint. Plaintiffs need not allege specific discharge dates occurring around or after the filing of the lawsuit since both plaintiffs and federal defendants contend

that private defendant's failure to remove improperly discharged material constitutes a continuing violation ... [T]reating the failure to take remedial measures is eminently reasonable. This is because it is not the physical act of discharging dredge wastes itself that leads to the injury giving rise to citizen standing, but the consequences of the discharge in terms of the lasting environmental degradation.

29 E.R.C. at 1943. In short, the disposal of wastes can constitute a continuing violation as long as no proper disposal procedures are put into effect or as long as the waste has not been cleaned up and the environmental effects remain remediable. The court in *Fallowfield* found similarly:

If a person disposes of hazardous waste on a parcel of property, the hazardous waste remains in that property insidiously infecting the soil and groundwater aquifers. In other words, the violation continues until the proper disposal procedures are put into effect or the hazardous waste is cleaned up ... To allow a citizen suit only in situations where the owner or operator of a hazardous waste facility is disposing of hazardous waste on a daily basis would virtually read section 7002 out of RCRA.

. . . .

Because improperly disposed of hazardous waste remains a remediable threat to the environment, this Court believes that Congress intended to allow citizen suits under section 7002 of RCRA for past violations where the effects of the violation remain remediable. To conclude otherwise would allow an owner or operator of a hazardous waste facility to avoid liability under section 7002 by claiming that the last improper disposal of hazardous waste prior to the commencement of the suit was the last disposal, making the violations wholly past. In this way, the owner or operator could easily avoid liability by simply not disposing of any hazardous waste after the commencement of a citizen suit. This Court does not believe that Congress intended to allow the owner or operator of a hazardous waste facility to have complete control over his liability under section 7002.

*Fallowfield*, 1990 WL 52745 at *10, *11, 1990 U.S. Dist. LEXIS at *29–30, *32–33.

The question then becomes whether in fact the landfill on plaintiff's property continues to cause or threaten environmental damage. The parties vigorously dispute this. Plaintiff's environmental expert stated at deposition that fill from the landfill which sits atop a natural stream is likely contributing uncontrolled runoff to the streams adjacent to the disposal site. The expert further noted that the underground fire at the site is currently burning out of control. In particular, McLaren/Hart Evaluation concluded that "[t]he levels of lead and zinc are of sufficient magnitude to likely produce biological effects and are characteristic of heavily contaminated sediments." Pl. Brief, Exhibit H at 3–4. The McLaren/Hart report concluded that the landfill was contributing lead and zinc to the adjacent wetlands area. *Id.* at 4.

The McLaren/Hart Evaluation further noted that "subsurface combustion of organic materials is presently occurring, as evidenced by smoke emitted from the surface over a significant portion of the surface fill. Evidence included smoke originating from blackened holes in the fill surface." *Id.* at 5. The report stated that as much as one third to one half of the northern portion of the landfill was experiencing unchecked underground fires. *Id.* Based on its findings, the McLaren Evaluation concluded that the landfill was properly classified as an "open dump" under 40 C.F.R. 257.2 and as a facility violating 40 C.F.R. 257.3.3 through its unpermitted discharge of pollutants into United States waters in violation of the National Pollutant Discharge Elimination System ("NPDES") under § 402 of the Clean Water Act.

In response, defendants contend that no evidence exists showing that pollutants are fouling any adjacent waters or wetland areas. As support, the Town points to a report completed by Frank A. Jones, an environmental toxicologist retained by defendant. Using data collected by Malcolm

Pirnie and McLaren/Hart, two environmental consultants retained by plaintiff, Dr. Jones concluded that the concentrations of toxins at the landfill were not expected to pose a threat to public health even if the property were developed for residential use. *See* Jones Declaration at 3–4.

The Jones Report did report higher concentrations of lead and zinc in the landfill stream and wetlands than were present in a northern stream located farther away. It also stated that "[t]he difference in concentrations from sampling locations that 'approximated samples' collected by Malcolm Pirnie and the fact that only a single sample was collected from the landfill stream and wetlands is possibly indicative of an isolated area of elevated lead and zinc in the sediment, but definitely indicates the need for additional sampling before concluding any impacts posed by the site." *Id.*, Geraghty & Miller Risk Evaluation at 2. In his report, Dr. Jones recognized a need for additional data before any firm conclusions could be drawn concerning the leakage of toxins from the landfill into the surrounding stream and wetlands. His report, however, concluded that no adverse impact on wildlife or aquatic life was expected. *Id.* at 7.

On the present record, this court cannot say as a matter of law that plaintiff can show no continuing violation of RCRA. Both sides agree that higher levels of lead and zinc are present in the sediment of the landfill stream and wetlands. If the leakage is from the landfill, if those toxins continue to leach into the surrounding soil and water, and if subsurface fires burn unchecked on significant portions of the landfill, plaintiff might indeed prove an ongoing harm. We offer no opinion on any of this. Our function is simply to recognize that landfill's present threat to the surrounding environment, a fact material to plaintiff's claim of a continuing violation of RCRA, is disputed. We must therefore deny defendants' motion for summary judgment on the RCRA claim.

2. Claim for Injunctive Relief

The Town also argues that whether or not plaintiff can show a continuing RCRA violation, the record does not support any claim for injunctive relief under either RCRA or CERCLA because no evidence demonstrates an actual or potential threat to human health or the environment exists.

The Town contends that plaintiff has offered nothing to demonstrate even potential adverse effects on human health or the environment that would tip the balance of equities in favor of the permanent injunction and excavation of the landfill at a cost of some $6 million. It maintains that plaintiff's environmental expert relied on monetarily compensable economic harms rather than RCRA's environmental interests to justify the excavation and removal of the landfill he advocated.

Defendants also argue that CERCLA provides no grounds for plaintiff's request for injunctive relief for an allegedly contaminated site but only recovery of certain costs incurred. Section 9607 makes violators liable for all costs of removal or remedial action only when incurred by the United States, a State, or an Indian tribe. 42 U.S.C. § 9607(a)(4)(A). All other persons are entitled to recover their necessary response costs. 42 U.S.C. § 9607(a)(4)(B). No mention is made of the ability of private individuals to win injunctive relief. Only § 9606(a) authorizes injunctive relief to abate imminent and substantial dangers to health and the environment, and that power was expressly limited only to the President acting through the Attorney General. 42 U.S.C. § 9606(a).

■ We conclude that CERCLA provides private persons no cause of action for injunctive relief to compel removal of a hazardous waste site. *See Cadillac Fairview/California, Inc. v. Dow Chemical Co.*, 840 F.2d 691, 697 (9th Cir.1988). Any other interpretation of §§ 9606 and 9607 would render the United States' authority to seek injunctive relief granted in § 9606 redundant. *State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1049 (2d Cir. 1985) (holding that § 9606 only gives the United States the authority to seek injunctive relief under CERCLA).

■ However, plaintiff's ability to seek injunctive relief under RCRA is another matter. Injunctive relief is available under § 6972(a). *Commerce Holding Co. v. Buckstone*, 749 F.Supp. 441, 445 (E.D.N.Y. 1990). Plaintiff maintains that defendant's stress on the lack of evidence regarding harm to human health and the environment misconstrues RCRA's requirements in § 6972(a)(1)(A) governing suits against persons who have violated RCRA with the separate requirements of § 6972(a)(1)(B). This latter subsection authorizes citizen suits against any person contributing to "the handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."

To the extent defendants contend that plaintiff must show an incontrovertible "imminent and substantial" harm to health and the environment defendant misreads the statute. The operative word in § 6972(a)(1)(B) is "may." Plaintiff need only show that the conditions at the landfill *may* present an imminent and substantial endangerment to human health or the environment. As discussed above, we conclude that plaintiffs have made a sufficient showing.

Further, we do not read RCRA to deny courts the power to issue injunctive relief when appropriate. We interpret defendants' emphasis to be on the inadequacy of legal remedies and absence of irreparable harm, the traditional prerequisites for injunctive relief, not on the issues of imminence and substantial endangerment. *See New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir.1989), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990) ("[T]o obtain a permanent injunction plaintiff must show the absence of an adequate remedy at law and irreparable harm if the relief is not granted.").

■ A violation of RCRA does not mean that a permanent injunction necessarily follows. *See Town of Huntington v. Marsh*, 884 F.2d 648, 651 (2d Cir.1989), *cert. denied*, 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990). "In applying the general equitable standards for the issuance of injunctions in the area of environmental statutes, the Supreme Court has explicitly rejected the notion that an injunction follows as a matter of course upon a finding of a statutory violation." *Id.* (citing *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 313, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982)). Plaintiff must still offer evidence of an irreparable harm before an injunction will be issued. *Id.* 884 F.2d at 653.

The case of *Town of Huntington*, though addressing claims brought pursuant to the National Environmental Policy Act and the Marine Protection, Research, and Sanctuaries Act of 1972, is not so dissimilar to the present case. In *Town of Huntington*, the underlying dispute concerned dumpsites for dredging materials taken from the Long Island Sound. In remanding the case to the district court for an evidentiary hearing on the appropriateness of injunctive relief, the Court of Appeals directed the district court to weigh the equities and interests presented. *Id.* at 654.

It also reiterated the Supreme Court's counsel that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, ie., irreparable. If such injury is *sufficiently likely*, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.* at 652 (emphasis included) (quoting *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987)). The court then highlighted the issue of whether plaintiff had met its burden of establishing "some actual or threatened injury to 'the physical, chemical and biological balance at the dump site.'" *Id.* 884 F.2d at 654.

Drawing the discussion back to the present case, the question becomes whether plaintiff can demonstrate that irreparable harm to health or the environment is at least sufficiently likely. Harm to plaintiff's economic interests bears no relevance

to this issue. Protection of health and the environment from the improper disposal of solid waste is RCRA's objective, not protection of plaintiff's plans to develop his property. *See* 42 U.S.C. § 6902. Irreparable harm is decidedly a factual issue. At this stage, we are not prepared to foreclose to plaintiff an opportunity to offer evidence on this issue.

Defendants argue strenuously that plaintiff's environmental expert, Michael Barbara, could not say at deposition that the landfill posed a threat to the environment or human health. Mr. Barbara never stated that no threat to the environment existed. He simply responded that he made no specific risk assessments. Barbara Dep. at 91–92. He did state that the groundwater at the site had not yet been adequately tested to make a determination regarding the extent of environmental contamination. *Id.* at 35. Barbara also stated that the relative toxicity of the landfill stream "would be an arguable point," its adverse environmental impacts, always a point of contention. *Id.* at 107, 109.

While his deposition testimony may not further plaintiff's case for irreparable harm, it does support a recognition that the threat posed by the landfill is a disputed factual issue. More importantly, Barbara's deposition is not the only evidence in the record. Plaintiff has offered other evidence from which a reasonable factfinder might infer a threat to the environment surrounding the landfill. As we noted earlier, the McLaren Evaluation did report elevated levels of lead and zinc in the stream lying underneath the landfill. It also determined that subsurface fires were burning uncontrolled in significant portions of the site. If proven at trial, a fact finder could infer from these facts that the landfill poses an actual, continuing threat to the area's environment that might justify its removal.

At this point, we offer no opinion as to whether plaintiff can meet its burden of showing irreparable harm. We simply read the record in a light most favorable to plaintiff and draw all reasonable inferences in his favor as the non-moving party, as we must when assessing defendant's motion for summary judgment. *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir.1991); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989). Because RCRA offers plaintiff a possible basis for his claim for injunctive relief, the Town's motion for summary judgment on plaintiff's claim for injunctive relief is denied.

### 3. Costs of Remediation

█ The Town also argues that summary judgment should be granted against plaintiff on his claim under RCRA for "costs of remediation." Plaintiff offers no counter-argument on this issue in his opposition papers. In any case, however, we are inclined to agree with defendants. RCRA does not authorize a plaintiff in a citizen suit to recover remediation costs. *See Commerce Holding*, 749 F.Supp. at 445. To hold otherwise would allow parties to pursue private remedies rather than acting as private attorney generals. Such was not the intention of RCRA. *See id.; see also Environmental Defense Fund, Inc. v. Lamphier*, 714 F.2d 331, 337 (4th Cir.1983).

█ Defendants also seek summary judgment on the issue of the Town's liability under CERCLA for "response costs" arising from a site visit and report completed by McLaren/Hart, one of plaintiff's environmental consultants. The Town argues that this evaluation cannot be considered a proper "response cost" since it did not undertake any risk evaluation or assess the landfill's threat to health or the environment. In a footnote to his opposition brief, plaintiff characterizes the question of whether the McLaren/Hart Evaluation should be considered a part of initial site investigation of the facility as a disputed issue of fact.

CERCLA provides a private right of action for recovery of "necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B). Section 9601(25) of CERCLA defines "response" as "remove, removal, remedy, and remedial action." The term "removal" is defined by

40 C.F.R. § 300.6 to include "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances." Under this definition, response costs might properly include the costs associated with assessments and evaluations of any releases of hazardous materials from the landfill.

Courts have held that initial preliminary investigatory and monitoring costs are recoverable irrespective of the recoverability of other response costs or compliance with the requirements of the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), 40 C.F.R. § 300 et seq. (1989). *See Carlyle Piermont Corp. v. Federal Paper Bd. Co.*, 742 F.Supp. 814, 821 (S.D.N.Y.1990); *see also Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 892 (9th Cir.1986) (holding that costs of testing and investigation recoverable even where no on-site cleanup costs are sought). Citing supporting cases, defendant agrees that "[c]ourts have allowed recovery of costs of initial investigation of the existence and extent of potential contamination." Def. Brief at 24.

Under the prevailing law, plaintiff might indeed recover under CERCLA for the costs borne during his initial evaluations of the landfill and its alleged releases of hazardous substances into the surrounding environment. Defendants argue that since the McLaren/Hart Evaluation did not complete a risk assessment or study appropriate remedies and was directed as showing economic injury it should not qualify as a proper response cost.

We find this reasoning unpersuasive. The McLaren/Hart Evaluation reported test results for samples from the landfill stream, its sediment, and adjacent wetlands for a variety of hazardous substances. The report compared the quantities found with samples taken from another stream farther removed from the landfill. It drew conclusions regarding the regulatory status of the landfill; and it offered remedial cost estimates. The McLaren/Hart Evaluation was certainly not a complete or final evaluation of the site. However, it is plainly related to the investigation of the extent of potential contamination and provided potentially important preliminary information on the nature of the releases from the landfill. Obtaining preliminary information on the levels of hazardous substances in the surrounding soil and sediment seems a necessary step before any further action can be properly taken. Consequently, the Town's motion to dismiss plaintiff's claim for response costs for the McLaren/Hart Evaluation is denied.

**B. The Town's Motion for Partial Summary Judgment on the State Law Claims**

Defendants also move for summary judgment on plaintiff's state law claims of trespass, nuisance, and inverse condemnation. Because defendants' argument challenging each claim intermingle, we shall attempt to address them issue by issue.

**1. Inverse Condemnation: Statute of Limitations**

Defendants contend that plaintiff's failure to pursue his inverse condemnation claim in state court bars him from raising it here. In particular, defendants argue that plaintiff should have availed himself of New York's inverse condemnation procedures for his claim of a "de facto appropriation." Secondly, defendants state that plaintiff's inverse condemnation claim is time-barred. According to the Town, any de facto appropriation that occurred took place in 1970 when it began its landfill activities. Under New York law, "there may be a taking of property without formal appropriation proceedings. The taking of property for public use without formal appropriation proceedings is known as a 'de facto appropriation.'" 51 *New York Jurisprudence 2d*, Eminent Domain, § 80 at 124–25. A de facto taking may result from:

a physical entry by the condemnor, a physical ouster of the owner, a legal interference with the physical use, possession or enjoyment of the property or a legal interference with the owner's power of disposition of the property.

*City of Buffalo v. J.W. Clement Co.*, 28 N.Y.2d 241, 321 N.Y.S.2d 345, 357, 269 N.E.2d 895, 903 (1971). In New York, the statute of limitations for a claim of de facto appropriation is three years. *See* N.Y.Civ. Prac.L. & R. § 214[4] (McKinney 1990).

 Defendants are arguing that the plaintiff's claim for de facto appropriation accrued when the Town first entered onto the property and began dumping fill. The cases cited by defendants, however, seem to differ from the present case in one important respect. After the government physically invaded in each of the cited cases the size of the appropriated property grew no larger.

*Sassone v. Town of Queensbury*, 157 A.D.2d 891, 550 N.Y.S.2d 161 (3rd Dep't 1990), involved a landfill encroaching upon someone's land and therefore seems most relevant to this case. In *Sassone*, the court ruled that a de facto taking had occurred when the town expanded its landfill onto plaintiff's land then fenced in the area it occupied, installed a tollgate, and contracted to have sand and gravel extracted from the land. *Id.* 550 N.Y.S.2d at 163. We note, however, that after the fence was erected, the intruding landfill was confined to the initial appropriation; the physical invasion was complete.

Likewise, in *Carr v. Town of Fleming*, 122 A.D.2d 540, 504 N.Y.S.2d 904 (4th Dep't 1986), the claim accrued when the condemnor entered the claimant's property and installed a sewer line. *Id.* 504 N.Y.S.2d at 906. In *Greenman v. City of Cortland*, 141 A.D.2d 910, 529 N.Y.S.2d 227, 228 (3rd Dep't 1988), *cert. denied*, ─── U.S. ───, 113 S.Ct. 194, 121 L.Ed.2d 137 (1992), the statute of limitations commenced when the government blacktopped a sidewalk on claimant's property. There is no indication that the government continued to expand the blacktop surfacing in *Greenman* or laid additional sewer lines in *Carr*. In each case, the intrusion continued in the sense that the appropriated property continued to be used (as a landfill, a sidewalk, and a sewer line). However, no additional property was appropriated.

The present case stands in marked contrast. Defendants are not alleged to have carried out a one-shot appropriation. Rather, the landfill operated by the Town continued to expand farther into plaintiff's property. In this sense, if a de facto appropriation occurred, it was a continuing invasion. Each new dumping which spilled fill onto new parts of plaintiff's land might be considered a new de facto appropriation by defendants. Hence, defendants' actions appear more like a continuing appropriation.

 In addition, it is unclear on the present record when the dumpings first intruded onto plaintiff's property. Given this uncertainty, we cannot hold as a matter of law, as defendants urge, that plaintiff's inverse condemnation claim arose in 1970. We also note that under New York law, the statutory time within which a claimant for damages to property permanently appropriated does not commence until the parameters of the land taken are determined and the claimant has been notified. *See Cultural Center Com. v. Kokoritsis*, 103 A.D.2d 1018, 478 N.Y.S.2d 199 (4th Dep't 1984); *Burrows Paper Co. v. State*, 174 Misc. 850, 22 N.Y.S.2d 47 (1940). The present record is unclear as to when the landfill's dimensions reached their final proportions.

Perhaps even more importantly, defendants' arguments concerning the de facto taking claim evidence an internal inconsistency. On the one hand, the Town argues that the de facto taking claim accrued as soon as materials were first dumped on plaintiff's property. Yet, defendants later argue that their actions should be viewed as, if anything, a de facto taking instead of a trespass because of the permanent nature of the dump, a permanency created by the dump's present size, depth, and lifetime on plaintiff's land. Arguing that the landfill could only be a de facto taking because of its present mass (and permanency) undercuts its argument that the statute of limitations on their de facto taking claim commenced at the landfill's inception, long before it achieved such size and permanency.

We do not expressly hold that plaintiff's claims only accrued in 1989. The point at which plaintiff could reasonably foresee the dump's permanency is not an issue we can decide as a matter of law on the present record. Similarly, we are not saying that plaintiff may wait "until any possibility of further damage [has] been removed." *Nadler Foundry & Machine Co. v. United States*, 143 Ct.Cl. 92, 164 F.Supp. 249, 251 (1958) (quoting *Columbia Basin Orchard v. United States*, 88 F.Supp. 738, 739, 116 Ct.Cl. 348 (1950)). Indeed, if subsurface fires are still burning and the landfill continues to leach toxins into the surrounding wetlands or water, it is quite evident that the possibility of further damage exists. Where such issues as the date of incursion onto plaintiff's land and the landfill's permanency are disputed, application of the three-year statute of limitations from 1970 would seem inappropriate. We therefore deny defendants' motion for summary judgment based upon the statute of limitations.

2. Failure to Pursue State Remedies: The Trespass vs. De Facto Takings Issue

■ The Town also contends that plaintiff's inverse condemnation or de facto taking claim should have been pursued in state court first. In particular, defendants state that Gache made no attempt to avail himself of remedies provided by New York. Plaintiff responds that his claim should not be viewed as a de facto taking claim at all, but rather as tort claims for trespass and nuisance. Defendants strenuously object to this particular line of argument by plaintiff. They stress that plaintiff expressly alleged a de facto taking in his second amended complaint. The Town oppose what they view as plaintiff's attempts to abandon his takings claim in favor of his tort claims.

Without question, plaintiff alleged both a de facto takings claim as well as a trespass claim in his second amended complaint. The complaint reads:

By creating, operating, and maintaining an ever increasing dump on plaintiff's property, defendants have progressively and cumulatively so interfered with the property rights of plaintiff that defendants' conduct constitutes a permanent de facto appropriation or inverse condemnation of plaintiff's property for which plaintiff is entitled to be paid just compensation.

Second Amended Complaint ¶ 62.

By raising his litany of claims, plaintiff appears to utilize the time-tested, though often ill-advised, "shotgun approach" to complaint drafting. However, the difference between the de facto takings claims and the tort claims is significant. Unlike the tort of trespass, a de facto taking—the practical equivalent of a condemnation—requires that defendants were acting for a lawful public purpose and the impact on the private property be considered permanent. Courts in New York have distinguished trespass and nuisance from de facto takings by focusing on the nature of the government's actions. In *Evans v. City of Johnstown*, 96 Misc.2d 755, 410 N.Y.S.2d 199, 202 (Sup.Ct.1978), the court, considering a case involving sewage leaks and noxious discharges from a municipal sewage plant onto a plaintiffs' land, stated that:

damages may be found to exist because of either unauthorized or illegal action on the part of the defendants which amounts to a trespass or a nuisance, or by authorized activity legal in all respects which so greatly diminishes the value of the plaintiffs' property that it amounts to a compensable taking.

*Id.* The court's statement underscores plaintiff's argument that an inverse condemnation or de facto taking claim requires that the government's exercise of eminent domain be founded upon an authorized, legal activity.

Because the unpermitted dumping appears patently illegal and the dump can be removed, plaintiff contends that his claim sounds more in trespass than in takings. Consequently, plaintiff contends that he need not have pursued the state inverse condemnation proceedings before raising his tort claims for trespass and nuisance in this court. By framing his argument this

way, plaintiff appears to confuse his claims with a claim of inverse condemnation purportedly made by the Town. We see no such affirmative defense by defendants. Therefore, plaintiff's lengthy arguments aimed at demonstrating the missing elements of an imaginary inverse condemnation defense are immaterial. Instead, defendant raised an affirmative defense of adverse possession, a claim that does not stem from the governments powers of eminent domain but from their open, hostile use of plaintiff's land. We address plaintiff's summary judgment motion aimed at this issue at a later point in this decision.

Rather, the crucial question on the de facto taking verses trespass issue is whether the Town's activities at the landfill should be considered permanent in nature as a matter of law making it a taking, or temporary in nature, as in a trespass. Citing cases such as *Mickel v. State*, 77 A.D.2d 794, 430 N.Y.S.2d 741 (4th Dep't 1980), *aff'd* 54 N.Y.2d 858, 444 N.Y.S.2d 916, 429 N.E.2d 423 (1981), plaintiff argues that the materials dumped on the Gache property can be removed, and therefore should be considered a temporary trespass.

In *Mickel*, the court held that a temporary intrusion constitutes a trespass, not a de facto appropriation. We certainly do not quarrel with this conclusion. However, the landfill on plaintiff's property is infinitely more serious (and less temporary) than the "Public Fishing" signs posted on the plaintiff's property in *Mickel*.

Plaintiff also stresses that removal of smaller-sized dumps is expressly envisioned by the Environmental Protection Agency ("EPA"). The EPA has stated that:

> Removal of contaminated soils at municipal landfill sites is generally limited to hot spots or, when practicable, to landfills with a low to moderate volume of waste (e.g. less than 100,000 cubic yards).

Conducting Remedial Investigation/Feasibility Studies for CERCLA Municipal Landfill Sites, U.S. EPA OSWER Directive 9355.3–11 (February 1991) at 4–13. There is no serious dispute over the fact that the dump located on the Gache property is approximately 60,000 cubic yards in volume. *See* Barbara Report at 8, 20–21. Plaintiff maintains that the fact that EPA would consider the landfill removable bolsters his argument that the dump should be viewed as a temporary occupant on his land.

Defendants stressed at oral argument that its dumping cannot be considered a temporary intrusion given the size, depth, and tenure of the landfill on Gache's land. The basic underlying facts appear undisputed. The landfill covers some 5.5 acres of land, consists of approximately 60,000 cubic yards of materials, and rises at points to 20 feet above grade. The landfill reached its present dimensions after an uninterrupted twenty-six years of growth and use. During this time, the Town regularly bulldozed clean fill over it and graded the landfill. As plaintiff alleges, the Town also controlled access to the dump through a locked gate and issued citations to unauthorized dumpers. These facts lend considerable strength to defendants' position.

While similar in some respects, the present case does differ from the cases cited by defendants to support their position that the landfill on Gache's land is permanent. In both *Carr*, 504 N.Y.S.2d 904, and *Sassone*, 550 N.Y.S.2d 161, the invasions of land were clearly ongoing and fixed in nature. In *Carr*, an active sewer line was installed permanently for public use. In *Sassone*, a dump had been integrated into an established, adjacent landfill and was actively used. Here, defendants' dump is closed with little prospect of reopening. In no way could it reasonably be considered an active, operating landfill. And, as plaintiff stresses, the landfill could be excavated, though that would likely be a costly alternative.

Defendants contend that if plaintiff claims that the Town's dump constitutes a de facto appropriation, plaintiff is barred from pursuing the matter as a trespass or nuisance. Under New York law, the Town is correct. "Inverse condemnation, rather than trespass, is the appropriate theory for granting damages to an injured landowner where the trespasser is cloaked with the

power of eminent domain." *Tuffley v. City of Syracuse*, 82 A.D.2d 110, 442 N.Y.S.2d 326, 330 (4th Dep't 1981). This seems perfectly obvious. If the Town took permanent possession of plaintiff's property, the Town has in effect taken ownership of the property. "An entry cannot be both a trespass and a taking because, in the latter instance, the condemnor acquires ownership." *Carr*, 504 N.Y.S.2d at 906.

In essence, plaintiff argues that if the dump is removed he should receive trespass damages for the harms it caused while it stood on his property. If the dump is not removed as an environmental hazard, or if in the wake of its removal the damages to his property render the property totally unusable, plaintiff seeks compensation for a permanent taking of his property. The issue of its permanency, however, is not something we intend to rule on as a matter of law.

The feasibility and advisability of its removal are contested. Given our uncertainty regarding the environmental threat posed by the landfill, we are not prepared to say that the dump should be considered a permanent or temporary fixture on plaintiff's land. The ultimate posture of plaintiff's suit may rest on whether the environmental harms are so egregious and damaging that removal is warranted and whether removal is a viable remedy. At the moment, however, this inquiry raises contested factual issues. Hence, we decline to characterize the dump as a permanent municipal facility as a matter of law as defendants urge. Because factual issues abound regarding the ability and propriety of removing the landfill, resolution of such issues must await trial. As a result, we deny defendants' motion for summary judgment on the de facto taking and trespass claims. For similar reasons, it follows that we shall not grant summary judgment against plaintiff on his nuisance claims.

C. Motion In Limine

■ As an alternative to its motion for summary judgment on the tort and inverse condemnation claims, the Town has also brought a motion in limine to preclude in-troduction of expert opinions from certain individuals designated by plaintiff. Defendants argue that plaintiff should be prohibited from introducing any expert opinions on valuation of the property since they fail to value the property at the time of the alleged taking, use improper valuation methods, and rely upon unsupported assumptions. Defendants also request an order in limine against three other experts designated by plaintiff because of their purported testimony concerning psychological impacts which defendants contend are factually unsupported and irrelevant to the property's valuation.

Defendants' objections to plaintiff's expert reports rest in large part upon their contention that 1970 is the proper point to assess the property's value. As a result, the Town argues that appraisals given between 1984 and 1992 are irrelevant. However, as we stated earlier, we are unpersuaded that defendants' appropriation (or trespass as plaintiff claims) was completed in 1970. To the contrary, the record shows that they proceeded for nearly twenty years after that. This leaves open the possibility that changing environmental damages impacted the ultimate commercial value of the land. And since the dumping stands more as a creeping invasion, freezing the valuation of damages in 1970 would seem improper.

Proper appraisal of the damages to plaintiff's property is an inherently factual question, and one which we will not attempt to resolve on summary judgment. At this juncture, we shall not delve into complex issues involving the fluctuating real estate market, the impact of the dump on the land's development potential, the methods of valuation, and the likelihood of plaintiff receiving the required approvals to develop his property. Their evidentiary weight and the ultimate valuation of the fair market value of plaintiff's land are obviously contested. Therefore, we decline to forever preclude plaintiff from offering his expert appraisals. Defendants' motion for summary judgment is denied.

**D. Defendants' Motion to Dismiss Plaintiff's Zoning Claims**

Defendants have also moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the eighth cause of action in plaintiff's second amended complaint, namely the claim of zoning violations by the Town. Defendants argue that as governmental bodies, they are immune from the zoning ordinances they have enacted. And because the disposal of refuse represents a necessary governmental function, the operation of a landfill is not subject to the Town's zoning restrictions.

In the past, New York courts held that a municipality is not subject to its zoning restrictions "in the performance of its governmental, as distinguished from its corporate or proprietary, activities." *Nehrbas v. Incorporated Village of Lloyd Harbor,* 2 N.Y.2d 190, 159 N.Y.S.2d 145, 147, 140 N.E.2d 241, 242 (1957). Waste disposal was properly considered a governmental function. *Id.* 159 N.Y.S.2d at 147, 140 N.E.2d at 242. Recognizing the explosion in waste produced in our society, New York courts observed that "the continued well-being and health of the community and its inhabitants ... demand that garbage be removed. The necessity creates the duty, and it is incumbent upon the municipality to assure its collection and disposal." *Id.* at 148, 140 N.E.2d at 242. Other courts in New York have followed suit. "[T]he operation of a landfill 'must today be stamped a governmental function.'" *Little Joseph Realty, Inc. v. Town of Babylon,* 41 N.Y.2d 738, 395 N.Y.S.2d 428, 431, 363 N.E.2d 1163, 1165 (1977) (quoting *Nehrbas,* 159 N.Y.S.2d at 147, 140 N.E.2d at 242)).

Use of the governmental-proprietary distinction, however, has eroded in recent years. In *Matter of County of Monroe,* 72 N.Y.2d 338, 533 N.Y.S.2d 702, 530 N.E.2d 202 (1988), the New York Court of Appeals held that a county's expansion of an airport was not subject to the zoning requirements of a city. Indeed, the court specifically highlighted the contradictory classifications reached when applying the public-private distinction to waste disposal. *See id.* 533 N.Y.S.2d at 703, 530 N.E.2d at 202 (compar-

ing the holdings of *Nehrbas* which found waste disposal a governmental function with *O'Brien v. Town of Greenburgh,* 239 A.D. 555, 268 N.Y.S. 173 (1933), which found it as proprietary function). It concluded that the governmental-proprietary test was a labeling device whose time had passed. *Id.* Applying this distinction "beg[s] the critical question of which governmental interest should prevail when there is a conflict between the zoning ordinance of one political unit and the statutory authority of another unit to perform a designated public function." *Id.*

The case in *County of Monroe* involved a direct conflict between the actions of two separate governmental units, a situation not present here. However, the court discussed more generally the illusory nature of the old governmental-proprietary distinction, in various contexts including a village's immunity from its own zoning ordinances at issue in *Nehrbas. See id.* (citing *Nehrbas,* 159 N.Y.S.2d 145, 140 N.E.2d 241). The Court of Appeals found the old test wanting, replacing it with a balancing approach that examines, *inter alia,* the nature of the land use involved, the extent of the public interest served, and alternative sites in less restrictive zoning areas. *See id.* 533 N.Y.S.2d at 704, 530 N.E.2d at 203.

The present case illustrates the limitations in arbitrarily applying a governmental-proprietary function test. It is undisputed that the Town operated this landfill to dispose of its road sweepings and collection of certain municipal materials. However, defendants charged money for private individuals to use the landfill to dispose of various waste materials. The Town's activities seem to cross the line dividing public from private behavior.

The factual record is at least unclear (and often contested) regarding the effect of the landfill on plaintiff's development plans, alternative sites for a landfill, and the environmental damage its has caused. The more severe the environmental harms, the more untenable it would be to hold that the balance of public and private interests tips in favor of allowing the Town's zoning

ordinances to shield its dumping activities with immunity. Given these factual uncertainties, we cannot hold as a matter of law that the Town is immune from the application of its own zoning restrictions. Defendants' motion to dismiss is denied.

### E. Defendants' Motion to Strike

■ As a secondary matter, defendants moved to strike the exhibits attached to plaintiff's memorandum opposing defendant's motion for partial summary judgment. They argue that certain exhibits representing unsworn reports by experts and unauthenticated documents are inadmissible hearsay. *See Fowle v. C & C Cola*, 868 F.2d 59, 67 (3rd Cir.1989) (substance of expert's report not sworn to could not be considered on motion for summary judgment). To the extent defendants seek to strike the submissions of Michael Barbara, Kenneth Brown, Norma Ruiz, and Norman Judelson as unsworn reports by experts, the issues have been mooted by plaintiff's submission of sworn declarations by each of these individuals swearing to the veracity of their statements.

No prejudice results to defendants since the sworn declarations have been submitted by plaintiff well in advance of trial and defendants were already fully cognizant of the opinions of plaintiff's experts, most particularly those of Michael Barbara, plaintiff's environmental consultant.

■ Regarding certain letters received by plaintiff from developers interested in purchasing plaintiff's property, plaintiff argues that they were not offered to prove that the writers were in fact interested in buying plaintiff's land. Rather, says plaintiff, they were simply submitted to demonstrate that letters indicating interest were received by plaintiff. Plaintiff also point out that a party opposing summary judgment need not prove its evidence in admissible form. *Healey v. Chelsea Resources, Ltd.*, 736 F.Supp. 488, 491 (S.D.N.Y.1990). Given this last point particularly, we decline to strike the letters offered as exhibits by plaintiff. Defendants' motion to strike is denied.

### F. Plaintiff's Motion for Summary Judgment

Turning to the plaintiff's motion, plaintiff asks the court for summary judgment on the Town's first counterclaim and twentieth affirmative defense for adverse possession. In essence, plaintiff contends that the undisputed facts demonstrate the Town's acknowledgment of Mr. Gache's ownership of the property during the prescriptive period.

■ Under New York law, to establish adverse possession a claimant must show that the possession was (1) hostile and under a claim of right, (2) actual, (3) open and notorious, (4) exclusive, and (5) continuous. *Castle Associates v. Schwartz*, 63 A.D.2d 481, 407 N.Y.S.2d 717, 721 (2d Dep't 1978). Each element must be proved to prevail on a claim of adverse possession. Plaintiff attacks the defendants' ability to demonstrate the element of claim of right. Acknowledgment that legal title resides in another, if made during the statutory period, necessarily negates the requisite element of claim of right. *Tonawanda v. Ellicott Creek Homeowners Ass'n*, 86 A.D.2d 118, 449 N.Y.S.2d 116, 121 (4th Dep't 1982).

■ Plaintiff's argument is straightforward. He argues that the Town's continuing assessment and collection of property taxes throughout the entire prescriptive period constitutes an acknowledgment of plaintiff's ownership of the property used by defendants for their landfill. In short, the Town's collection of taxes completely negates its claim of right, by its nature defeating any adverse possession claim.

In support of this position, plaintiff cites several state court decisions outside this jurisdiction. For example, in *Hamilton v. Village of McCall*, 90 Idaho 253, 409 P.2d 393 (1965), the court expressly held that adverse possession could not be established under the state statute unless the claimant had paid all the property taxes levied on the property claimed. In *City of Burlingame v. Norberg*, 210 Cal. 105, 290 P. 587 (1930), the court concluded that where a Town introduced no evidence showing that

it did not collect taxes, it could not establish a claim of right to that property. Conversely, in *Hair v. Norman*, 389 P.2d 634 (Okla.1963), the court found that the city's removal of property from the tax rolls evidenced its claim of right to that land.

None of these cases, however, is entirely convincing. In *Hamilton*, for example, payment of taxes was an express requirement for an adverse possession claim. In Idaho, failure to pay property taxes alone defeats a person's adverse possession action. No such statutory requirement exists under New York law. Further, the fact that removal of a property from the tax rolls, while certainly highly significant to the issue of the city's claim of right in *Hair v. Norman*, does not mean that tax collection is determinative in all cases.

In their briefs and during oral argument, defendants conceded that taxes were collected on the full acreage owned by the plaintiff. The parcel of land involved in this case comprises 77 acres, of which the landfill occupies approximately 5.5 acres. The Town argued that the continuing collection of taxes was simply "a ministerial, clerical, often automatic function which cannot necessarily be regarded as a knowing admission that someone else has title." Def. Brief at 6. They also argue that the cases cited by plaintiff involve states whose statutes have made payment of taxes an express requirement for an adverse possession claim, not the present situation. More importantly, defendants contend that tax collection is not necessarily determinative but simply one factor to consider, particularly when other circumstances establish a town's adverse possession.

■ We have discovered no cases in New York which directly address the issue of whether a town's assessment and collection of property taxes necessarily defeats its adverse possession claim to a portion of that property. In 1901, the New York Court of Appeals in *Consolidated Ice Co. v. Mayor of New York*, 166 N.Y. 92, 59 N.E. 713 (1901), held that evidence of a city's levying of taxes and assessments on a property is not evidence of actual or constructive possession. *Id.* at 101, 59

N.E. at 715. This does not mean that a city's tax assessments are not evidence of its claim of right (or lack thereof) to the taxed property. *Consolidated Ice* simply says that *possession* is not proven by tax assessments.

After surveying the relevant law in other jurisdictions, we conclude that the payment of taxes by plaintiff is clearly material evidence to the issue of adverse possession. But we do not hold, as plaintiff argues, that it is necessarily determinative as a matter of law. In *Lilly v. Palmer*, 495 So.2d 522 (Ala.1986), the Alabama Supreme Court held that "proof of the payment of taxes by either the [adverse possession] claimant or the legal title holder is evidence to be considered in evaluating an adverse possession claim; but, it simply is not determinative on the question of adverse possession." *Id.* at 527. While noting that payment of taxes in connection with visible acts of ownership may be evidence tending to show claim of ownership, the court stated that "the legal title holder may use proof of his payments of the property taxes to controvert an element of the claimant's prima facie case of adverse possession." *Id.* at 527 n. 2.

Other courts have similarly held that the payment of property taxes alone is not sufficient to defeat an adverse possession claim. *See, e.g., Terry v. City of Independence*, 388 S.W.2d 769, 773–74 (Mo.1965); *Northwoods Development Corp. v. Klement*, 24 Wis.2d 387, 394, 129 N.W.2d 121 (1964); *Downing v. Bird*, 100 So.2d 57, 61 (Fla.1958); *Metropolitan St. Louis Sewer Dist. v. Holloran*, 756 S.W.2d 604, 605 (Mo. Ct.App.1988).

There is no doubt that who pays the property taxes is at least a significant indicator of who owns the property by claim of right. This fact was recognized in such cases as *Superior Oil Co. v. Harsh*, 126 F.2d 572 (7th Cir.1942), where the court emphasized that the record title owner of a property on which a school house had been built had always paid the taxes on the whole property, without exception for the land used for the school. *Id.* at 574. As a result, the court held that defendants could

establish no claim of adverse possession. *Id.*

Plaintiff indisputably paid taxes on his entire property—all 104 acres—including the land occupied by the Town's dump. Each year the Town accepted his payments, without ever removing any portion of the land from the property tax rolls. It may be that the Town's right hand, its tax collectors, did not know what its left hand, the highway maintenance crews, were doing regarding plaintiff's land. The question is whether these facts alone defeat its adverse possession claim. Under what appears to be the general consensus of other jurisdictions, we think not. Because the adverse possession claimant in the case at bar is the very same entity that levied and collected the taxes on plaintiff's property for some twenty years, the tax payments may take on added evidentiary weight undercutting the defendants' claim of right. However, since payment of taxes is usually treated as only one factual element of an adverse possession claim, we shall not attempt to resolve the adverse possession issue as a matter of law. Plaintiff's motion for summary judgment is denied.

### III. CONCLUSION

To conclude, we deny the Town's motion for summary judgment in all respect except insofar as plaintiffs are seeking injunctive relief under CERCLA or remediation costs under RCRA. In addition, the Town's motion in limine, the defendants' motion to strike, defendants' motion to dismiss plaintiff's claim of zoning violations, and plaintiff's summary judgment motion are also denied. A conference will be held on March 11, 1993 at 5:15 p.m. to make final arrangements for adding this case to the trial calendar.

SO ORDERED.