K. Murdock **MURRAY,** et al., **Plaintiffs,**

v.

**BATH IRON WORKS CORPORATION,** et al., **Defendants.**

Civ. No. 93–188–P–DMC.

United States District Court, D. Maine.

Aug. 17, 1994.

Marcia J. Cleveland, Brunswick, ME, for plaintiffs.

Constance P. O'Neil, Arlyn H. Weeks, Beth A. Nightingale, Conley, Haley, O'Neil & Kaplan, Bath, ME, for defendant Bath Iron Works Corp.

Stephen E.F. Langsdorf, Preti, Flaherty, Beliveau & Pachios, Augusta, ME, for defendant Dauphin.

## MEMORANDUM DECISION ON CROSS MOTIONS FOR SUMMARY JUDGMENT[1]

DAVID M. COHEN, United States Magistrate Judge.

This action arises from defendant Bath Iron Works Corporation's ("BIW") disposal of industrial waste at a landfill in Bath, Maine previously owned and operated by Eugene Dauphin.[2] The plaintiffs in this action are various individuals who live or have lived in the Tarbox Hill area of Bath, a residential community allegedly affected by leachate from the so-called Dauphin landfill. The plaintiffs press a myriad of federal and state claims against BIW, including citizen claims under the Resource Conservation and Recovery Act, the Clean Water Act and the Comprehensive Environmental Response, Compensation and Liability Act, as well as numerous state tort law claims. The plaintiffs and BIW have both moved for summary judgment on a number of these claims.[3]

### I. Summary Judgment Standards

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). In determining if this burden is met, the court must view the record in the light most favorable to the nonmoving party and "give that party the benefit of all reasonable inferences to be drawn in its favor." *Ortega–Rosario v. Alvarado–Ortiz,* 917 F.2d 71, 73 (1st Cir. 1990) (citation omitted). "Once the movant has presented probative evidence establishing its entitlement to judgment, the party opposing the motion must set forth specific facts demonstrating that there is a material and genuine issue for trial." *Id.* at 73 (citations omitted); Fed.R.Civ.P. 56(e); Local R. 19(b)(2). A fact is "material" if it may affect the outcome of the case; a dispute is "genuine" only if trial is necessary to resolve evidentiary disagreement. *Ortega–Rosario,* 917 F.2d at 73.

### II. Facts

From the 1960s until its formal closing in 1986, Eugene Dauphin operated a waste disposal site on a portion of a large parcel of land he owned in Bath, Maine. Complaint ¶ 46; BIW's Statement of Material Facts

---

1. Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge David M. Cohen conduct all proceedings in this case, including trial, and to order the entry of judgment.

2. Dauphin, named as an original defendant, was recently dismissed from the case. *See* endorsement on Joint Motion of Plaintiffs and Defendant Dauphin to Dismiss Defendant Dauphin Without Prejudice (Docket No. 28).

3. Both sides have requested oral argument. Satisfied that I am able to address the issues presented on the basis of the parties' written submissions and my own research, I deny the requests. *See* Local R. 19(f).

(Docket No. 25) ¶ 1. This site consists of two landfill areas, one roughly seven acres in size, the other approximately eleven acres in size. BIW's Statement of Material Facts ¶ 1. The site lies west of the Tarbox Hill neighborhood in Bath. *Id.* BIW purchased most of the waste disposal site from Dauphin on December 14, 1989. *Id.* ¶ 7.

From the 1960s until February 1985, BIW disposed of industrial waste from its Bath shipyard facility at the Dauphin site. *Id.* ¶ 2. This waste, both solid and liquid, consisted of oils, paints, solvents, sandblasting grit, incinerator ash, asbestos and other industrial refuse.[4] Some of this waste contained hazardous substances. Appendix, Vol. IX, BIW's Response to Plaintiff's Request for Admissions ¶¶ 3, 5. BIW stopped disposing of liquid waste at the Dauphin site in 1979 and sent no waste to the site after February 1985. Herman Affidavit ¶¶ 6–7.

In 1978 Kenneth Murray discovered sludge from the Dauphin site on his property. Appendix, Vol. X., att. G, ¶ 8.[5] He called the Maine Department of Environmental Protection ("DEP"). *Id.* ¶ 9. In response to Murray's complaint, DEP visited the Dauphin site and contacted BIW concerning its disposal of hazardous waste there. Appendix, Vol. X, att. J (Sept. 22, 1978 DEP memorandum); Herman Affidavit ¶ 8. In the course of its inquiry, DEP found that surface water leaving the site contained unacceptable levels of toxic chemicals and that leachate was draining from the eastern and western borders of the site.[6] Appendix, Vol. X, att. J

(Dec. 5, 1978 memorandum & Sept. 22, 1978 memorandum). BIW proposed and submitted an operating plan for the site in 1979. Herman Affidavit, att. 2 ("Closing Plan"), app. A. DEP approved the operating plan in 1980. *Id.*

In 1984, following continued problems with the site, including continued leachate flow, DEP recommended closure of the landfill. Appendix, Vol. X, att. K. DEP requested BIW to submit a closing plan, including a proposal for monitoring the groundwater on the perimeter of the site. *Id.* BIW submitted a closing plan for part of the site in February 1985. *See* Closing Plan. This plan was subsequently approved by DEP in May 1985, with modifications. *See* Appendix, Vol. III, exh. 61. In accordance with this closing plan, BIW installed a clay cap on the western portion of the site. Herman Affidavit ¶ 10. BIW also installed six monitoring wells to evaluate the groundwater quality around the western portion of the landfill. Phase I Remedial Investigation Report at 1–6.

In 1986 and 1987 DEP sampled the site's monitoring wells and eleven residential wells from the surrounding residential area. DEP 1988 Order ¶¶ 8, 10; Phase I Remedial Investigation Report at 1–7. Groundwater samples from the monitoring wells evidenced the presence of various hazardous substances. DEP 1988 Order ¶ 8. Groundwater samples from the eleven residential wells also indicated elevated levels of volatile organic compounds and metals. Phase I Re-

---

4. *See generally* Exhibits to BIW's Memorandum in Support of Motion for Summary Judgment, Exh. A. ("Herman Affidavit"), att. 3 ("DEP 1988 Order") ¶ 5 & att. 5 ("Phase I Remedial Investigation Report") at 1–6; Appendix to Plaintiffs' Motion for Summary Judgment ("Appendix"), Vol. III, York Deposition at 11–15, exhs. 46–48 & Vol. X, att. R ("Real Estate Appraisal of Tarbox Hill") pt. 2 at 12–13.

5. BIW argues that Murray's affidavit is facially insufficient under Fed.R.Civ.P. 56(e) because it recites that, in addition to personal knowledge, it was made upon information and belief. The same is true of Leo Laine's and Susan Murray's affidavits. *See* Appendix, Vol. X, att. D ("S. Murray Affidavit") & att. O ("Laine Affidavit"). However, if it is clear that the affidavit statements are made on the basis of the affiant's personal knowledge, they satisfy the require-

ments of Rule 56(e), regardless of a blanket recitation stating otherwise. *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir.1990). Accordingly, I have relied upon the cited affidavits only to the extent that I can infer that specific statements were based on the affiants' personal knowledge.

6. "When groundwater infiltrates the landfill, the water mixes with the material in the landfill and forms leachate. Leachate is a liquid that has passed through or emerged from solid waste and contains soluble, suspended, or miscible materials removed from such wastes. The leachate is generated both by percolation of precipitation into the landfill mass and by the flow of groundwater through the refuse in the landfill." *Dague v. City of Burlington*, 935 F.2d 1343, 1347 (2d Cir.1991), *rev'd in part on other grounds*, —— U.S. ——, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992).

medial Investigation Report at 1–7; Appendix, Vol. IV, exh. 93. The contamination levels for both sets of wells exceeded the Maine Department of Human Services's action levels and maximum contaminant levels in drinking water for some substances. DEP 1988 Order ¶ 11. Samples of surface water exiting the site also evidenced contamination. *Id.* ¶ 12.

Concerned that hazardous substances were present in the residents' drinking water, in December 1986 DEP advised those inhabiting the eleven residences with contaminated wells to cease drinking their water. *Id.* ¶ 13. BIW agreed to install a permanent public waterline to provide the eleven affected residences with an alternate water supply. *Id.* ¶ 14; Phase I Remedial Investigation Report at 1–7. BIW provided bottled water to the residences until installation of the public waterline was completed in July 1987. Herman Affidavit ¶ 10.

In July 1987 BIW prepared and submitted to DEP a surface clean-up plan for the site. Phase I Remedial Investigation Report at 1–7. Started in September 1987, the surface clean-up consisted of the removal of surface wastes, including scrap metal, junked cars and five gallon storage containers. *Id.* This material was shipped to a disposal site in Natick, Massachusetts. *Id.*

In January 1988 DEP designated the site an uncontrolled hazardous substance site. *See generally* DEP 1988 Order. DEP found that the continued presence of hazardous substances at the site, given the proximity of the site to residential areas, presented a continuing danger to public health and environmental safety. *Id.* at p. 21. In particular, DEP cited the presence of numerous hazardous substances at the site that had entered and continued to enter the groundwater beneath and adjacent to the site. *Id.* at pp. 20–21. DEP thus determined that "[t]he actual or threatened releases of hazardous substances from the Site pose a threat or hazard to the public health, safety or welfare and to the natural environment." *Id.* at p. 21. As a result, DEP concluded that remedial action was necessary at the site to abate the threat of further release of contaminants. *Id.*

The record is unclear as to what actions, if any, were taken by either DEP or BIW from 1988, following DEP's designation of the landfill as an uncontrolled hazardous substance site and its call for remedial action, until 1992. Apparently, discussions took place in 1988 among DEP, BIW and Dauphin concerning a consent agreement that would address a remedial investigation and feasibility study of the entire site. Phase I Remedial Investigation Report at 1–8. BIW filed a revised, draft consent agreement with DEP in 1988 for a remedial investigation and feasibility study, but the record does not indicate what action was taken on this proposal. *See id;* Herman Affidavit ¶ 12.

In early 1992 discussions between DEP and BIW resumed in response to concerns raised by the residents of Tarbox Hill. Phase I Remedial Investigation Report at 1–8. In February 1992 Leo Laine, a Tarbox Hill resident who lives downhill from the Dauphin site, discovered a trail of yellowish substance in the ice on his neighbor's yard. Laine Affidavit ¶¶ 1–2; Real Estate Appraisal of Tarbox Hill, pt. II, p. 14. Laine notified various city and state officials of his discovery, as well as other Tarbox Hill residents. Laine Affidavit ¶¶ 4–13. From their inquiries, some residents learned for the first time that DEP had designated the Dauphin site an uncontrolled hazardous substance site in 1988. *See* Laine Affidavit ¶¶ 12–13; S. Murray Affidavit ¶¶ 2–3. This prompted the formation of a neighborhood action group to investigate possible contamination stemming from the Dauphin site. S. Murray Affidavit ¶¶ 4–5; Real Estate Appraisal of Tarbox Hill, pt. II, p. 14.

In response to concerns raised by residents, DEP developed and implemented a sediment and water sampling program for the Tarbox Hill area. Phase I Remedial Investigation Report at 1–8. The results of the May 1992 sampling program indicated that levels of hazardous substances found in the soil and water did not constitute a significant health concern. Herman Affidavit, att. 4 ("DEP 1992 Findings"). In August 1992 DEP reported that "[t]esting of samples of soil and ground water taken from the Tarbox Hill area do not indicate an imminent threat

to the public health or safety due to the presence of hazardous substance compounds." *Id.* at 7 (Bates stamp # 00105). DEP testing indicated that the levels of hazardous materials detected in the Tarbox Hill area were not uncommon for an urban residential area. *Id.* at 1 (Bates stamp # 001064), 4. Although testing did reveal elevated levels of lead and PAH compounds in one sampling location, DEP noted that these were common contaminants and surmised that they were probably unrelated to the Dauphin site. *Id.*

As a result of its May 1992 testing, the state concluded that "there was nothing ... to suggest that Tarbox Hill residents are being exposed to hazardous levels of contaminants from the Dauphin Site." Appendix, Vol. V, Exh. 103 (Sept. 1992 Maine Dep't of Human Servs. letter). While noting that Tarbox Hill residents had likely faced exposure to contaminants in the past, prior to the extension of the public water line in 1987, Maine's Bureau of Public Health stated that it had "no evidence at present to suggest that any further exposure to contaminants from Dauphin is occurring." *Id.*

At around the same time DEP was conducting its sampling of the Tarbox Hill area, BIW proposed to DEP that a remedial investigation be undertaken to define the current conditions of the site. Phase I Remedial Investigation Report at 1–9. A work plan was submitted by BIW in August 1992 and approved by DEP in October 1992, with minor modifications. *Id.* The draft report on the Phase I remedial investigation was completed in February 1994. Herman Affidavit ¶ 20; *see generally* Phase I Remedial Investigation Report (dated February 1994).

The Phase I remedial investigation determined that groundwater along the perimeter of the site and surface water flowing from the site met state and federal drinking water standards. Phase I Remedial Investigation Report at ES–2. Only one sample, collected from a groundwater monitoring well located in the central portion of the site, exceeded state and federal drinking standards for one compound—benzene. *Id.* Soil and sediment samples from the site showed low levels of some metals and other compounds, but this apparently did not pose a significant source of contamination to the groundwater, since the water quality at the perimeters of the site met primary drinking water standards. *Id.* at ES–1 to ES–2, 5–3 to 5–4. For remedial action, the report recommended excavating the contaminated soil and sediment and capping the eastern portion of the site, so as to eliminate any possibility of human exposure to those contaminants. *Id.* at ES–3 to ES–4, 6–1 to 6–2. Given that the groundwater quality met drinking water standards at the site perimeter, however, the February 1994 report concluded that a risk assessment to determine health impacts from the landfill was unnecessary. *Id.* at ES–4.

### III. Legal Analysis

#### A. Count I (RCRA)

In Count I, the plaintiffs claim that the Dauphin landfill may pose an imminent and substantial endangerment under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.* Under the citizen suit provisions of RCRA, a private plaintiff may assert a civil claim against "any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). The plaintiffs have moved for summary judgment on this claim on the ground that toxic substances are present at the site and the site is not properly controlled, thus demonstrating the existence of an imminent and substantial endangerment. BIW has also moved for summary judgment on this claim on the grounds that the plaintiffs failed to comply with the statutory notice provisions for citizen suits under RCRA, the plaintiffs' citizen suit is precluded by the state's administrative actions to clean up the site and the site does not currently present an imminent and substantial endangerment.

■ I conclude that neither party is entitled to summary judgment on Count I. Ad-

dressing BIW's procedural arguments first, I find that the plaintiff has complied with the notice and delay provisions of RCRA. Under 42 U.S.C. § 6972(b)(2)(A), no action may be commenced under section 6972(a)(1)(B) prior to ninety days after the plaintiffs have given notice to the EPA Administrator, to the state and to any person alleged to have contributed to the storage or disposal of the solid or hazardous waste. Such notice is a mandatory precondition to a citizen suit and the action must be dismissed if the provision has not been met. *Hallstrom v. Tillamook County,* 493 U.S. 20, 26, 110 S.Ct. 304, 308–09, 107 L.Ed.2d 237 (1989). In addition, under 42 U.S.C. § 6972(b)(2)(F), after a citizen suit is brought, a copy of the complaint must be served on the United States Attorney General and the EPA Administrator.

The record indicates that prefiling notice in this case was given to the appropriate people in early March 1993, more than ninety days before the suit was filed on July 14, 1993. *See* Appendix, Vol. IX (notice letters) & Vol. X, att. B (return receipts). Although late in the game, a copy of the complaint was served upon the Attorney General and the EPA Administrator in May 1994. *See* Appendix, Vol. X, att. A, C. The statutory provision requiring service on the Attorney General and the EPA Administrator does not specify a time limitation for service. *Petropoulos v. Columbia Gas of Ohio, Inc.,* 840 F.Supp. 511, 516 (S.D.Ohio 1993).

 I also find that the plaintiffs' citizen suit is not precluded by the state's prosecution of its own action to restrain or abate the conditions which may present the alleged endangerment, as mandated by the preclusion provision of 42 U.S.C. § 6972(b)(2)(C). Under that provision, no citizen suit may be commenced under section 6972(a)(1)(B) if the state is engaged in one of three specific types of remedial action.[7] The record before me does not establish that Maine is currently engaged in pursuing any of those three enumerated forms of remediation. The First Circuit case cited by BIW, *North & South Rivers Watershed Ass'n. v. Town of Scituate,* 949 F.2d 552 (1st Cir.1991), is inapposite on this issue, since it involves an interpretation of a dissimilar preclusion clause found in the Clean Water Act dealing with a pending state administrative action comparable to the administrative penalties subsection of that act.

 As for the merits of Count I, to prevail the plaintiffs must show that the waste disposed and stored at the site, waste that does constitute solid waste under RCRA,[8] "may present an imminent and substantial endangerment to health or the environment." To prove that an imminent and substantial endangerment may exist, the plaintiffs need not prove actual harm; they need only show a risk of threatened or potential harm. *Dague,* 935 F.2d at 1355–56. In addition, although RCRA as a whole is basically prospective in approach, designed to prevent improper disposal of waste in the future, a citizen suit under section 6972(a)(1)(B) does reach past conduct involving the disposal of solid waste, but only to the extent that such past conduct continues to produce a present endangerment. *Connecticut Coastal Fishermen's Ass'n. v. Remington Arms Co.,* 989 F.2d 1305, 1316 (2d Cir.1993); *Price v. United States Navy,* 818 F.Supp. 1323, 1325 (S.D.Cal.1992); *United States v. Ottati & Goss, Inc.,* 630 F.Supp. 1361, 1400 (D.N.H.1985).

---

7. 42 U.S.C. § 6972(b)(2)(C) reads:

 No action may be commenced under subsection (a)(1)(B) of this section if the State, in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment—
 (i) has commenced and is diligently prosecuting an action under subsection (a)(1)(B) of this section;
 (ii) is actually engaging in a removal action under section 104 of the Comprehensive Envi-

ronmental Response, Compensation and Liability Act of 1980; or
 (iii) has incurred costs to initiate a Remedial Investigation and Feasibility Study under section 104 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 and is diligently proceeding with a remedial action under that Act.

8. RCRA provides an expansive definition of solid waste, which includes "discarded material" resulting from industrial or commercial operations. 42 U.S.C. § 6903(27).

■ On the plaintiffs' motion for summary judgment on this issue, viewing the facts in the light most favorable to BIW, I find that a material issue of fact exists concerning whether the Dauphin site may currently present an imminent and substantial endangerment. Based on the recent findings from the 1992 DEP sampling and the Phase I remedial investigation, particularly with respect to the potability of the water on the perimeter of the site, I cannot conclude that, as a matter of law, the site may currently pose an imminent and substantial endangerment. *See Vernon Village, Inc. v. Gottier,* 755 F.Supp. 1142, 1154–55 (D.Conn.1990). Likewise, on BIW's motion for summary judgment on this issue, viewing the facts in the light most favorable to the plaintiffs, I cannot conclude that the site, as a matter of law, does not present an imminent and substantial endangerment. Based on the continued presence of contaminants in the soil and the past migration of these substances into the groundwater, *see* Appendix, Vol. IX, BIW's Response to Plaintiff's Request for Admissions ¶¶ 6, 32–33, I cannot say that the site currently presents no threat to the environment or public safety. *See Gache v. Town of Harrison,* 813 F.Supp. 1037, 1041 (S.D.N.Y.1993). Accordingly, this issue must be reserved for trial.

### B. Count II (RCRA)

In Count II, the plaintiffs claim that the site has failed to comply with the closure and post-closure requirements of RCRA, 42 U.S.C. § 6972(a)(1)(A). Under the citizen suit provisions of RCRA, a private plaintiff may assert a civil claim against "any person ... who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter." 42 U.S.C. § 6972(a)(1)(A). The plaintiffs have moved for summary judgment on the grounds that BIW has violated the federal closure and post-closure standards for hazardous waste disposal sites. As with Count I, BIW has moved for summary judgment on the procedural grounds that the plaintiffs have failed to comply with the applicable notice provisions and the state's administrative actions bar this claim. BIW has also moved for summary judgment on Count II on the substantive ground that the applicable provisions of RCRA it allegedly violated have been superseded by Maine's EPA-authorized hazardous waste management program.

■ Addressing the procedural arguments first, BIW asserts that Count II is precluded by the plaintiffs' failure to comply with the prefiling notice requirements of 42 U.S.C. § 6972(b)(1)(A) and the state's pursuit of an administrative action to clean-up the site. The prefiling notice provisions pertinent to Count II require only 60 days notice to the EPA Administrator, the state and the alleged violator, *see* 42 U.S.C. § 6972(b)(1)(A), and, as already discussed with respect to Count I, this timing element has been satisfied.

As for the preclusion clause pertinent to Count II, a citizen action under section 6972(a)(1)(A) is precluded only if the state "has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance" with the standards allegedly violated. 42 U.S.C. § 6972(b)(1)(B). Since the record is devoid of any suggestion that Maine has commenced any court action against BIW, as required by the relevant preclusion clause, the plaintiffs' claim under section 6972(a)(1)(A) is not barred.

■ On the merits of Count II, as an initial matter I note that a citizen suit under section 6972(a)(1)(A), unlike a citizen suit under section 6972(a)(1)(B), is prospective only, applying to ongoing or recurring violations of RCRA requirements. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 57–59, 108 S.Ct. 376, 380–82, 98 L.Ed.2d 306 (1987). Thus, the plaintiffs can prevail only if they show an ongoing or recurring violation by BIW of RCRA requirements. *City of Heath v. Ashland Oil, Inc.,* 834 F.Supp. 971, 980 (S.D.Ohio 1993). In addition, a direct action under section 6972(a)(1)(A) is unavailable where the applicable federal requirements of RCRA have been superseded by an EPA-authorized state hazardous waste program pursuant to 42 U.S.C. § 6926(b). *Dague,* 935 F.2d at 1352–53; *Ashland Oil,* 834 F.Supp. at 978–79;

*Lutz v. Chromatex, Inc.*, 718 F.Supp. 413, 425 (M.D.Pa.1989) (*Lutz I* ).

■ Effective May 20, 1988, Maine received final EPA authorization under 42 U.S.C. § 6926(b) to operate its state hazardous waste management program in lieu of the RCRA hazardous waste program, subject to the limitations imposed by the Hazardous and Solid Waste Amendments of 1984 ("HSWA"). 53 Fed.Reg. 16264, 16266–67; *see also* List of C.F.R. Sections Affected, 1988, 40 C.F.R. § 271 (July 1, 1993 ed.). This authorization, having not been withdrawn, has remained in full effect since that time. *See* 42 U.S.C. § 6926(e) (withdrawal of authorization).

In their motion for summary judgment, the plaintiffs allege violations of various federal closure and post-closure standards under 42 U.S.C. § 6925(a) and 40 C.F.R. § 264. These provisions, however, have been superseded by Maine's EPA-authorized hazardous waste management program. *See* 40 C.F.R. § 264.1(f). The plaintiffs have not identified any violation of the provisions of RCRA, such as those enacted under HSWA, that would have survived Maine's receipt of final authorization to operate its own program.[9] *See* *Ashland Oil,* 834 F.Supp. at 979–80; *Lutz I,* 718 F.Supp. at 426. Accordingly, because those provisions of RCRA allegedly violated by BIW have been superseded by Maine's program, no direct action lies under section 6972(a)(1)(A) for this court to remedy an ongoing or recurring violation of those provisions. Past violations of RCRA, predating Maine's receipt of final EPA authorization, as alleged by the plaintiffs, are not cognizable under section 6972(a)(1)(A).

■ This is not the end of the matter, however. According to the two courts that have squarely addressed the issue, a citizen suit under section 6972(a)(1)(A) is still available for violations of a state authorized program, since the state program, in having received EPA authorization under RCRA,

"has become effective" pursuant to RCRA, as required by section 6972(a)(1)(A). *Sierra Club v. Chemical Handling Corp.,* 824 F.Supp. 195, 197 (D.Colo.1993); *Lutz v. Chromatex, Inc.,* 725 F.Supp. 258, 261 (M.D.Pa.1989) (*Lutz II* ); *see also Village of Oconomowoc Lake v. Dayton Hudson Corp.,* 24 F.3d 962, 964 (7th Cir.1994); *Sierra Club v. Larson,* 2 F.3d 462, 469 (1st Cir.1993). *But see Ashland Oil,* 834 F.Supp. at 979 (disagreeing though not deciding the issue). I agree. Moreover, as the plaintiffs have pointed out, Maine's EPA-authorized program has adopted and incorporated the federal closure and post-closure requirements of 40 C.F.R. § 264.310. *See* Me. Dep't of Envtl. Protection Regs. 854.8(H) (March 16, 1994). Accordingly, having specifically asserted that BIW violated 40 C.F.R. § 264.310, *see* Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment (Docket No. 32) at 25, the plaintiffs can pursue such a claim under 42 U.S.C. § 6972(a)(1)(A) as a violation of Maine's RCRA-authorized program.[10]

■ On the merits of that precise claim, however, summary judgment is unavailable to either party. I note that the closure and post-closure requirements of 40 C.F.R. § 264.310 speak in terms of "final closure." The plaintiffs have not made any showing that this stage has been reached. On the other hand, I note that the eastern portion of the landfill remains uncapped, *see* Phase I Remedial Investigation Report at 6–1, but that the DEP-approved closing plan called for the complete capping of the site by 1985, *see* Closing Plan at 2, 5. Accordingly, I am unable to conclude that, as a matter of law, BIW is not presently in violation of the closure requirements of 40 C.F.R. § 264.310, as incorporated by Maine's program.

Therefore, to the extent that Count II remains, alleging a violation of 40 C.F.R. § 264.310 through its incorporation into Maine's authorized program, summary judgment for either the plaintiffs or BIW is de-

---

9. The requirements and prohibitions that have taken effect under HSWA, and thus are still enforceable in Maine pursuant to the federal program, are listed at 40 C.F.R. § 271.1(j) (tables 1 & 2).

10. I note that in their summary judgment submissions the plaintiffs have not alleged any other violations of Maine's closure and post-closure requirements as set forth in Me. Dep't of Envtl.Protection Regs. 854.8(H).

nied. But to the extent that Count II alleges violations of 42 U.S.C. § 6925(a) and the other provisions of 40 C.F.R. § 264, summary judgment is granted in favor of BIW.

### C. Count III (CWA)

In Count III, the plaintiffs, pursuant to the citizen suit provision of the Clean Water Act ("CWA"), *see* 33 U.S.C. § 1365, allege that leachate from the landfill is being discharged through point sources to the navigable waters of the United States without a proper permit, in violation of 33 U.S.C. § 1311(a). The plaintiffs have moved for summary judgment on this claim. BIW also moves for summary judgment, once again on the basis of the lack of prefiling notice and the pending state involvement with the clean-up of the site, as well as the lack of any proof of an ongoing discharge of pollutants.

■ On BIW's procedural arguments, as on Counts I & II, I find that the plaintiffs complied with the notice and service requirements of CWA. *See* 33 U.S.C. § 1365(b)(1) (60 day prefiling notice); 33 U.S.C. § 1365(c)(3) (service of complaint on Attorney General and EPA Administrator). As for the state's administrative involvement with the site, I first note that CWA's preclusion provisions are more extensive than those under RCRA. CWA precludes citizen suits where the state has commenced and is diligently prosecuting (1) a civil or criminal action to require CWA compliance, 33 U.S.C. § 1365(b)(1)(B), or (2) an action under a state law comparable to the administrative penalties subsection of the CWA, 33 U.S.C. §§ 1319(g)(6)(A), 1365(a). As previously noted, the record is devoid of any indication that the state has commenced a judicial action with respect to the Dauphin site. BIW, however, citing to the First Circuit's *North & South Rivers Watershed Ass'n* case, argues that Maine's administrative action in seeking clean-up of the site bars the plaintiffs' CWA claim, pursuant to 33 U.S.C. §§ 1319(g)(6)(A) & 1365(a).

I find that the state's administrative actions to date relating to the Dauphin site are not of the type that would bar the plaintiffs' CWA citizen claim. In *North & South Rivers Watershed Ass'n*, the Massachusetts Department of Environmental Protection had commenced an administrative action against an alleged polluter under the provisions of the Massachusetts Clean Waters Act. 949 F.2d at 553–54. This state clean water act mirrored the structure and goals of CWA and authorized the Massachusetts DEP to assess penalties that directly corresponded to the penalty provisions of CWA. *Id.* at 554. Because of these close parallels to CWA, the First Circuit held that a citizen suit under CWA was precluded by 33 U.S.C. § 1319(g)(6)(A), since the state was prosecuting an action under a state law comparable to the administrative penalties subsection of CWA. *Id.* at 556.

That is not the case here. Maine has not undertaken any administrative action under its clean water legislation, *see, e.g.,* 38 M.R.S.A. § 361 *et seq.* (Ch. 3, Protection and Improvement of Waters), § 1317 *et seq.* (Ch. 13, subch. III, Hazardous Matter Control). Instead, Maine has undertaken a broader approach, declaring the Dauphin site a threat to public health and mandating abatement actions, but with no specific emphasis on the protection of waterways. *See* 38 M.R.S.A. §§ 1361–71 (Ch. 13–B, Uncontrolled Hazardous Substance Sites). Maine's current administrative actions relate to the general management of the Dauphin site as a hazardous substance site, and not to the specific concerns surrounding the discharge of pollutants into water, as does CWA or its Maine counterpart. Accordingly, I find that the plaintiffs' CWA claim is not barred by the state's prosecution of an action under a state law comparable to the administrative penalties subsection of CWA, as provided for in 33 U.S.C. § 1319(g)(6)(a), because such an action has not been initiated.

■ As for the merits of the plaintiffs' CWA claim, reading numerous sections together, CWA basically makes it unlawful for any person to discharge any pollutants from any point source into navigable waters of the United States without obtaining a pollution discharge permit and complying with its terms. *See* 33 U.S.C. §§ 1311(a), 1342(a), 1362(12), 1365(a)(1), 1365(f)(1); *Connecticut Coastal Fishermen's Ass'n*, 989 F.2d at 1310–11. A "point source" is a discrete conduit or

conveyance in which pollutants are collected or channelled, 33 U.S.C. § 1362(14); *Concerned Area Residents for the Env't v. Southview Farm*, 834 F.Supp. 1410, 1418 (W.D.N.Y.1993), while a "pollutant" includes almost all solid, chemical and industrial waste in water, 33 U.S.C. § 1362(6). In addition, as with section 6972(a)(1)(A) of RCRA, a citizen action under CWA is prospective only, requiring either a continuous or intermittent violation. *Gwaltney*, 484 U.S. at 57–59; *Mattoon v. City of Pittsfield*, 980 F.2d 1, 6 (1st Cir.1992).

█ The plaintiffs claim that leachate from the landfill, after passing through manmade drains, enters two streams that run from the site and lead eventually to the Kennebec River and Merrymeeting Bay, which are navigable waterways. *See* Phase I Remedial Investigation Report at 1–2 to 1–5. Leachate draining from a landfill through a point source may well constitute the discharge of a pollutant. *See, e.g., Dague*, 935 F.2d at 1347, 1354–55.

BIW does not contest the existence of point sources at the site, nor does it suggest that it has a permit for the discharge of pollutants. Appendix, Vol. IX, BIW's Response to Plaintiff's Request for Admissions ¶¶ 38, 40, 43. The issue, as BIW argues, thus boils down to whether leachate is in fact presently flowing from the site through the point sources. The plaintiffs only proof at this stage that leachate is flowing from the site is the testimony of their expert, Timothy Stone, and his photographs from the perimeter of the site showing oxidized discoloration. Appendix, Vol. VI (Stone Deposition) at 131–34, exhs. 123–47. Stone testified that the discoloration was indicative of leachate flow from the site. *Id.* at 131, 132.

This testimony, however, does not establish that leachate is actually flowing from the site, let alone that it is flowing from the site through point sources. According to BIW's hydrogeologist, until off site surface water areas are chemically tested, no factual conclusion can be reached as to whether landfill leachate is discharging from the site. *See*

Exhibits to BIW's Statement of Material Facts as to Which There Exists a Genuine Issue to be Tried, or as to Which There is no Support in the Record, exh. 3, ¶¶ 5–6. Indeed, such oxidized discoloration may be naturally occurring, *id.* ¶ 5, or result from some other iron source from the surrounding urban environment, *see* DEP 1992 Findings at 5–6.

On the other hand, addressing BIW's motion for summary judgment on the CWA claim, I note that the engineers who conducted the Phase I remedial investigation plan to test for leachate flow from the site in Phase II of their evaluation. Exhibits to BIW's Statement of Material Facts as to Which There Exists a Genuine Issue to be Tried, or as to Which There is no Support in the Record, exh. 3, ¶¶ 5–6. Hence, BIW's own experts have not ruled out the possibility of leachate flowing from the site. Combined with Stone's testimony that the oxidized discoloration indicates leachate and the undisputed existence of manmade drainage areas, this is sufficient to raise a triable issue of fact as to whether leachate discharge is presently occurring through a point source. *Concerned Area Residents*, 834 F.Supp. at 1417.

### D. Count IV (CERCLA)

In Count IV, the plaintiffs seek recovery of response costs from BIW pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* Under CERCLA, any person may recover from a responsible party any necessary costs of response, consistent with the national contingency plan, incurred as a result of a release or threatened release of hazardous substances from a waste disposal facility.[11] 42 U.S.C. § 9607(a)(4)(B); *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1152 (9th Cir.1989). The plaintiffs seek to recover the costs they incurred in responding to the migration or threat of migration of hazardous wastes from the Dauphin site, including past and future medical costs. BIW has moved for summary judgment on this count, arguing that the costs sought by the plaintiffs have

---

11. Responsible parties under CERCLA include owners of waste disposal facilities, 42 U.S.C. § 9607(a)(1), and any person who possessed haz-
ardous substances and arranged to have them disposed, *id.* § 9607(a)(3). This obviously covers BIW.

not been pleaded with sufficient particularity. In the alternative, BIW claims that the medical expenses sought by the plaintiffs do not constitute "response costs" recoverable by private plaintiffs under CERCLA.

■ On the sufficiency of the pleadings, I find that the plaintiffs, having alleged that they have personally incurred response costs in light of a threatened migration of hazardous waste from the Dauphin site, have pleaded their claimed response costs with sufficient particularity. Complaint ¶ 123. While the plaintiffs must allege that they personally incurred response costs, as they have done, they need not particularize those costs. *Arawana Mills Co. v. United Tech. Corp.*, 795 F.Supp. 1238, 1243–44 (D.Conn.1992). The plaintiffs' allegation in the complaint that they personally incurred costs in responding to the threatened migration of hazardous waste from the site was sufficient to give BIW fair notice of the plaintiffs' claim for response costs under CERCLA, the purpose of federal pleading. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, — U.S. —, —, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517, 524 (1993); *Conley v. Gibson*, 355 U.S. 41, 47 (1957).

■ On the merits of the claim, CERCLA defines "response costs" to include the costs of both "removal" and "remedial" actions. 42 U.S.C. § 9601(25). "Removal" actions are further defined:

The terms "remove" or "removal" means [sic] the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary [sic] taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary

evacuation and housing of threatened individuals not otherwise provided for, action taken under section 104(b) of this Act [42 U.S.C. § 9604(b) ], and any emergency assistance which may be provided under the Disaster Relief Act of 1974 [42 U.S.C. §§ 5121 *et seq.*].

*Id.* § 9601(23). "Remedial" actions are defined as follows:

The terms "remedy" or "remedial action" means [sic] those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment.

*Id.* § 9601(24).

Based on these definitions, the general consensus among federal courts is that private medical monitoring costs are not recoverable as response costs under CERCLA, since they do not relate to preventing public contact with the released contaminants, which is the type of action set forth in the definitions of "removal" or "remedial" action. *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1532–37 (10th Cir.1992); *Yslava v. Hughes Aircraft Co.*, 845 F.Supp. 705, 708 (D.Ariz.1993); *Price v. United States Navy*, 818 F.Supp. 1322, 1322–23 (S.D.Cal.1992); *Bolin v. Cesna Aircraft Co.*, 759 F.Supp. 692, 713–14 (D.Kan. 1991); *Werlein v. United States*, 746 F.Supp. 887, 901–04 (D.Minn.1990); *Lutz v. Chroma-*

*tex, Inc.,* 718 F.Supp. 413, 417–18 (M.D.Pa. 1989). *But see Williams v. Allied Automotive, Autolite Div.,* 704 F.Supp. 782, 784 (N.D.Ohio 1988); *Brewer v. Ravan,* 680 F.Supp. 1176, 1179–80 (M.D.Tenn.1988). I agree. Only governmental entities may recover the cost of medical monitoring, as performed by the Agency for Toxic Substances and Disease Registry pursuant to the dictates of CERCLA. 42 U.S.C. §§ 9604(i), 9607(a)(4)(D); *Daigle,* 972 F.2d at 1537.

 Costs associated with the sampling and testing of the alleged contamination from the Dauphin site, however, would be recoverable, *Arawana,* 795 F.Supp. at 1243, provided they are in fact response costs and not litigation-related expenses, *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 972 F.2d 453, 461 (1st Cir.1992). Whether the response costs allegedly incurred by the plaintiffs, *see* Murray Affidavit ¶ 8, were in fact necessary and consistent with the national contingency plan, as required for CERCLA recovery under section 9607(a)(4)(B), presents factual issues to be resolved at trial. *See Cadillac Fairview/California, Inc. v. Dow Chemical Co.,* 840 F.2d 691, 695 (9th Cir.1988). Accordingly, I grant summary judgment for BIW on the plaintiffs' claims for medical monitoring expenses under CERCLA, but deny it as to the remaining response costs claims.

### E. Pendent Jurisdiction

 BIW has requested that the court refuse to exercise pendent or supplemental jurisdiction over the plaintiffs' state law claims. At this juncture of the proceedings, with a trial date firmly set for four months hence, I decline to do so. Given that the bulk of the plaintiffs' four federal claims have survived summary judgment, and that the state law claims derive from a common nucleus of operative facts, the exercise of supplemental jurisdiction over the state law claims at this point is wholly appropriate. 28 U.S.C. § 1367(a); *White v. County of Newberry,* 985 F.2d 168, 172 (4th Cir.1993); *Arawana Mills,* 795 F.Supp. at 1248–49.

In addition, nothing about this case counsels particularly strongly against the application of supplemental jurisdiction. 28 U.S.C.

§ 1367(c). The five state law claims, sounding in strict liability and negligence, do not substantially predominate over the four distinct federal strict liability claims, nor do they present strikingly novel or complex issues of law. *See Arawana Mills,* 795 F.Supp. at 1248–49. *Cf. Town of Jaffrey v. Town of Fitzwilliam,* 846 F.Supp. 3, 6 (D.N.H.1994) (nine state law claims substantially predominated over two CERCLA claims; state law claims presented several unsettled questions of state law). Indeed, except for perhaps Count VII (ultrahazardous activity), the plaintiffs' state law claims are fairly common and straightforward. *Kleen Laundry & Dry Cleaning Services, Inc. v. Total Waste Management, Inc.,* 1994 W.L. 287747, *5 (D.N.H. June 28, 1994); *Arawana Mills,* 795 F.Supp. at 1248. Moreover, this court, sitting in Maine and being familiar with Maine law, is competent to make a determination based on Maine law whether the plaintiffs may assert specific claims under state law. *See Kleen Laundry,* 1994 W.L. 287747 at *4 (distinguishing *Town of Jaffrey* ); *see also Hanlin Group, Inc. v. International Minerals & Chem. Corp.,* 759 F.Supp. 925, 933 (D.Me.1990) (determination on claim for ultrahazardous activity under Maine law). As for the scope of relief available under Maine law, the fact that the remedies available on the state claims differ from those available on the federal claims does not mean that the state claims substantially predominate over the federal claims. *White,* 985 F.2d at 172; *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1050 (2d Cir.1985); *Arawana Mills,* 795 F.Supp. at 1248–49. Each one of the plaintiffs' nine claims, federal and state, seeks a specific remedy for a specific harm or injury.

Finally, to the extent that the state claims involve issues triable to a jury, whereas the majority of the federal claims do not, I believe that the resolution of the nonjury federal issues may be easily directed to the court after the presentation of the entire case without likely causing juror confusion. *But see Town of Jaffrey,* 846 F.Supp. at 6. In the absence of juror confusion, interests of judicial economy, convenience and fairness dictate, especially at this late date, that the

state and federal claims be tried together in a combined bench and jury trial. *Kleen Laundry*, 1994 W.L. 287747 at *5; *see also Mill Invs. v. Brooks Woolen Co.*, 797 F.Supp. 49, 52 (D.Me.1992).

## F. Count V (Trespass)

█ In Count V, the first of the five state law claims, the plaintiffs allege that wastes from the Dauphin site have trespassed onto their property and continue to be present. BIW has moved for summary judgment on the ground that the applicable six-year statute of limitations has run on this claim.

The plaintiffs allege that waste from the Dauphin site has migrated onto their lands on at least three separate occasions: 1978, 1986 and 1992. *See* Plaintiffs' Objection to Defendant's Motion for Summary Judgment (Docket No. 42) at 15–16. In 1978 sludge allegedly flowed onto the property of Kenneth Murray; in 1986 sampling of the residential wells in the Tarbox Hill area indicated the presence of chemicals linked to the site; and in 1992 surface seeps allegedly showed the presence of contaminants from the site. *See* Facts, *infra*, pp. 3–4, 5, 6–7. The plaintiffs' complaint in this action was filed on July 14, 1993.

█ The plaintiffs' complaint asserts that the presence of BIW's waste on their property constitutes a continuing trespass. Complaint ¶ 129. Maine's six-year statute of limitations, *see* 14 M.R.S.A. § 752, does not bar this claim. To the extent that the plaintiffs can show that wastes from the site continue to be present on their land, regardless of when they entered, they can maintain an action for a continuing trespass under Maine law, since that tort would be continually occurring for statute of limitations purposes. *Russell v. Brown*, 63 Me. 203, 204–05 (1874); *Esty v. Baker*, 48 Me. 495, 499 (1860); *Restatement (Second) of Torts* § 161, cmt. b (1965); D. Zillman et al., *Maine Tort Law*, § 5.09 at 5–17 to 5–18 (1994). Of course, to prevail on any trespass claim, the plaintiffs will need to show that BIW was at least negligent in causing its waste to enter their land.[12] *Hayes v. Bushey*, 160 Me. 14, 17, 196

A.2d 823 (1964). At this stage, however, they have alleged facts sufficient to make out a prima facie case of trespass under Maine law, *id.* at 21, 196 A.2d 823, which is enough to survive a motion for summary judgment.

## G. Count VI (Private Nuisance)

█ In Count VI, the plaintiffs allege that the Dauphin site constitutes an ongoing private nuisance. As with the trespass claim, BIW has moved for summary judgment on the ground that the statute of limitations has run.

Maine law recognizes a damages claim for a continuing private nuisance. 17 M.R.S.A. § 2701; *Pettengill v. Turo*, 159 Me. 350, 356–57, 193 A.2d 367 (1963). As long as the nuisance continues unabated, a plaintiff may bring successive actions for damages throughout its continuance, *Pettengill*, 159 Me. at 356, 193 A.2d 367, with the statute of limitations providing no bar, again since the tort is ongoing. Summary judgment for BIW is therefore denied on Count VI.

## H. Count VII (Ultrahazardous Activity)

█ In Count VII, the plaintiffs allege that BIW's disposal and storage of hazardous waste at the Dauphin site constitutes an ultrahazardous activity for which BIW is strictly liable for the continuing harm that waste has caused the plaintiffs. BIW has moved for summary judgment on the ground that Maine does not recognize such a claim.

The Law Court has yet to address this particular issue. However, based on this court's reasoning in *Hanlin Group v. International Minerals & Chem. Corp.*, 759 F.Supp. 925 (D.Me.1990), I conclude that Maine, as have other jurisdictions, would likely recognize a cause of action for strict liability for the disposal and storage of hazardous waste. *Id.* at 933 & n. 13; *see also* Zillman, § 14.05 at 14–19 to 14–20. BIW has proffered no compelling reasons why this court should now deviate from the *Hanlin* case. Summary judgment is therefore denied on Count VII.

---

**12.** Further, only those plaintiffs in possession of the allegedly contaminated property may bring an action for trespass. *See* Zillman et al., § 5.02 at 5–5.

### I. Count VIII (Negligence)

In Count VIII, the plaintiffs allege that BIW's negligence in disposing of and storing its wastes at the Dauphin site has resulted in harm to the plaintiffs. BIW has moved for summary judgment, once again arguing that the statute of limitations has run.

The plaintiffs' claim for negligence arising out of the alleged 1978 and 1986 migrations, in which the injuries were immediately apparent, are barred by the six-year statute of limitations. To the extent that the alleged 1992 migration is separate and distinct from the earlier migrations, a negligence claim for that incident is not barred, since the injury resulting from that incident would not have arisen until 1992. Unlike Counts V & VI, this count does not assert a tort of an ongoing or continuous nature, such that the statute of limitations would not bar a claim for damages for continuing harm.

### J. Count IX (Failure to Warn)

In Count IX, the plaintiffs allege that BIW failed to warn them of the hazards posed by the Dauphin site. BIW has moved for summary judgment on the basis that it fails to state a claim cognizable under Maine law. In their response to BIW's motion for summary judgment, the plaintiffs do not identify the legal obligation that purportedly imposed upon BIW the duty to warn the plaintiffs of the dangers posed by the Dauphin site. I note that BIW was not the owner of the site while it was in operation. In the absence of any showing of a duty on BIW's part, summary judgment is granted in favor of BIW on this count. *See Quadrino v. Bar Harbor Banking & Trust Co.*, 588 A.2d 303, 304 (Me.1991).

### K. Damages

BIW has also asked the court to limit the damages recoverable by the plaintiffs on their state law claims, to the extent those claims survive its motion for summary judgment. BIW has argued that certain damages sought by the plaintiffs are not recoverable on the claims they have asserted.

On the continuing trespass and nuisance counts, which BIW has lumped together analytically, BIW claims that the plaintiffs are unable to recover damages for the permanent diminution in the value of their homes, *see* Complaint, Request for Relief ¶ 5, for the reason that a continuing trespass or nuisance by definition is abatable and therefore not permanent, *see, e.g., Merry v. Westinghouse Elec. Corp.*, 684 F.Supp. 852, 855 (M.D.Pa.1988); *Restatement (Second) of Torts* § .162, cmt. e. For a continuing private nuisance under Maine law, however, I note that the plaintiffs may recover damages for the loss of the use and enjoyment of their property resulting from the nuisance during its continuance, "together with such special damage (*including permanent injury to land* ), as may be proved." *Pettengill*, 159 Me. at 357, 193 A.2d 367 (emphasis added). Consequently, BIW's request for a limitation of permanent damages on the continuing nuisance and trespass claims, which it has lumped together, is denied.

BIW has also asked the court to strike some of the plaintiffs' requested damages connected to their negligence claim. First, the plaintiffs have requested damages for the risk of future adverse health effects. Complaint ¶ 145, Request for Relief ¶ 8. As BIW has pointed out, the *fear* of future illness, a form of emotional distress, is recoverable under Maine law. *In re Moorenovich*, 634 F.Supp. 634, 636–37 (D.Me.1986). Recovery for the *risk* of future adverse health effects is not recoverable, however, because it is too speculative. *Id.* at 636. Accordingly, the plaintiffs' claims for damages for the risk of future adverse health effects must be struck.

The plaintiffs have also claimed emotional distress damages in connection with their negligence claim. *See* Complaint ¶¶ 104, 145, Request for Relief ¶ 7. Contrary to BIW's assertion, the plaintiffs were not required to bring a separate claim for emotional distress; emotional distress can be an element of the damages recoverable under a claim of negligence. *Packard v. Central Me. Power Co.*, 477 A.2d 264, 268 (Me.1984). To the extent that the plaintiffs can prove at trial that they have suffered severe, foreseeable emotional distress as a result of BIW's

negligence, *see* Complaint ¶¶ 104–05; Exhibits to BIW's Memorandum in Support of Motion for Summary Judgment, exh. D, ¶¶ 8, this form of damages is recoverable, *see Federal Dep. Ins. Co. v. S. Prawer & Co.*, 829 F.Supp. 439, 451 (D.Me.1993).

## IV. Conclusion

For the foregoing reasons, the plaintiffs' motion for summary judgment is *DENIED*. BIW's motion for summary judgment is GRANTED in full as to Count IX and in part as to Counts II (claims under 42 U.S.C. § 6925(a) and provisions of 40 C.F.R. § 264 other than section 264.310), IV (claims for medical monitoring expenses) and VIII (negligence claims arising out of the 1978 and 1986 migrations). In addition, summary judgment is *GRANTED* in favor of BIW on the plaintiffs' claims for damages for the risk of future adverse health effects. In all other respects BIW's motion for summary judgment is *DENIED*.