**People of the State of CALIFORNIA, City of Lodi, Plaintiffs,**

**v.**

**M & P INVESTMENTS, et al., Defendants.**

**No. CIV S–00–2441 FCD JFM.**

United States District Court, E.D. California.

Nov. 20, 2003.

Randall A. Hays, City Attorney, City of Lodi, California, Michael C. Donovan, Cecelia C. Fusich, Envision Law Group LLP, Lafayette, CA, for Plaintiff.

Lori J. Gualco, Attorney at Law, Downey Brand LLP, Stephen J. Meyer, Sacramento, CA, for Defendants.

*MEMORANDUM AND ORDER*

DAMRELL, District Judge.

This matter is before the court on plaintiff City of Lodi's ("plaintiff" or "Lodi") motion for partial summary judgment of the counterclaim asserted by defendant Guild Cleaners, Inc. ("Guild") pursuant to section 7002(a)(1)(A) of the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6942(a)(1)(A).

Guild opposes the motion. The court heard oral argument on July 25, 2003.

## BACKGROUND [1]

### A. Factual Background

Lodi first detected the hazardous substance tetrachoroethylene ("PCE") in its municipal waster supply wells in June 1989. After the contamination was discovered, Lodi began testing groundwater samples from a limited number of downtown municipal supply wells. (Guild's Third Amended Counterclaim, filed June 13, 2002, ("Counterclaim") ¶ 25.) The testing revealed elevated levels of PCE and trichloroethylene ("TCE") and, as a result, Lodi closed a limited number of municipal supply wells, some of which were later reopened. (*Id.*)

Two state agencies, the California Regional Water Quality Control Board, Central Valley Region ("RWQCB") and the California Department of Toxic Substance Control ("DTSC") initiated investigations to identify potential sources of the PCE and TCE contamination. According to Guild's allegations, the RWQCB concluded that the two possible means for the releases of PCE and TCE in the groundwater were (1) direct releases to the ground, and (2) discharges to Lodi's sewer system, which then were released to the subsurface through the sewer line. (*Id.* ¶ 27.) Similarly, Guild contends that the DTSC concluded that the conduit for contamination was (1) land disposal of solvent waste, (2) discharge of solvent waste to the sewer system, and (3) Lodi's operation of certain water supply wells. (*Id.* ¶ 30.)

### B. Guild's RCRA Section 7002(a)(1)(A) Counterclaim

Count Eight of Guild's Third Amended Counterclaim alleges a citizen suit for injunctive relief pursuant to RCRA section 7002(a)(1)(A), 42 U.S.C. § 6972(a)(1)(A). Guild asserts that Lodi is responsible for contaminating both soil and groundwater at, and under, the Lodi site of contamination.[2] (*Id.* ¶ 36.) Specifically, Guild contends that Lodi contributed to the contamination by: (1) improperly disposing and releasing hazardous wastes into the soil and groundwater on property owned by Lodi, (2) inadequately designing, constructing, and maintaining its water supply system, and (3) negligently operating its sewer system. (*Id.* ¶ 36.) The nucleus of allegations are briefly summarized below.

#### 1. The Softball Complex

Guild alleges that Lodi contributed to contamination at a Lodi-owned property referred to by the parties as the "The Softball Complex."[3] According to Guild, Lodi employees improperly collected used drums that had previously contained hazardous wastes, including PCE and TCE, for use as garbage receptacles. (*Id.* ¶ 37.) Guild asserts that "[f]or an undetermined

---

1. For the general history of contamination within the City of Lodi, see *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 934–35 (9th Cir.2002), *cert. denied*, 538 U.S. 961, 123 S.Ct. 1754, 155 L.Ed.2d 512 (2003). Because the environmental history is not necessary to determination of the present motion, it is not repeated here.

2. Guild's counterclaim defines the "Lodi Site" as "an area in excess of six hundred (600) acres in the City of Lodi, California, generally bounded by Turner Road to the

north, Kettleman Lane to the south, Cherokee Lane to the east, and Ham Lane to the west, where it has been alleged that certain Hazardous Substances and Hazardous Waste, consisting of primarily chlorinated, volatile, organic compounds ('VOCs') have contaminated both the soil and groundwater." (Counterclaim ¶ 16.)

3. "The Softball Complex" refers to a property located at the corner of North Stockton Street and Lawrence Avenue in Lodi, California. (Guild's Opp. to Summ. Judgt. at 1.)

period of time" Lodi employees or agents "rinsed these drums and disposed of the residue from the rinsing to the ground." (*Id.*) Guild further alleges that "[i]n or about the early 1990's, [Lodi] or its employees or agents dumped drums [containing hazardous substances] at a parcel or parcels" in an area that was owned by Lodi and is described as the "North Local Area." (*Id.*) With respect to the Softball Complex, Guild cites to specific regulations promulgated pursuant to RCRA that it alleges Lodi has violated, including: (1) failure to appropriately operate the facility (40 C.F.R. § 264.31); (2) failure to appropriately and sufficiently inspect the facility (40 C.F.R. § 264.15); (3) failure to establish a corrective action program for all or some of the facility (40 C.F.R. § 264.100); and (4) failure to appropriately close the facility (40 C.F.R. § 264.111). (Guild's Opp. to Summ. Judgt. ("Opp."), at 10.)

### 2. The City Yard

Guild claims Lodi improperly used its Parks & Recreation Maintenance Yard, known as "The City Yard," as a hazardous waste storage and disposal facility.[4] (Opp. at 11.) According to Guild, from 1984 through 2001, Lodi used the City Yard for general maintenance and repairs of various kinds, including park and lawn equipment, such as mowers and edgers. (*Id.*) During the course of operations, Lodi allegedly routinely used solvents and other chemicals, and stored them in unmarked barrels and discarded them in an underground "waste oil tank." (*Id.* at 12.) Guild alleges Lodi employees at the City Yard routinely (1) rinsed and emptied out the contents of 55–gallon barrels which contained kerosene, motor oil, and gear oil, and (2) discarded brake fluid, antifreeze, parts-cleaning solvents, and kerosene into the

underground waste oil tank. (*Id.*) Based upon the alleged past activities, Guild contends Lodi's City Yard is a release site for PCE and other hazardous wastes because testing has revealed the presence of such wastes in the soil at the City Yard. (*Id.*)

### 3. Lodi's Water Supply System

Guild also asserts that Lodi's water supply system contributed to the transportation and disposal of hazardous wastes and substances, including PCE and TCE, throughout the Lodi site. (Counterclaim ¶ 39.) As part of its water supply system, Guild contends that Lodi operated, and continues to operate, certain municipal supply wells that were, and are, releasing hazardous substances and wastes into the soil and groundwater. (*Id.* ¶ 40.) In particular, Guild alleges Lodi owns and operates one or more municipal supply wells that "have or had leaking seals, which permit the vertical migration of Hazardous Substances and Hazardous Wastes along the outside of the well casing to groundwater." (*Id.* ¶ 41.) Further liability is alleged based upon Lodi's improper construction of its municipal supply wells, which permits hazardous wastes and substances to "migrate vertically within the well borings" because of "slots or breaks in the well casings, which connect the various water bearing zones of divergent pressures ..." (*Id.* ¶ 42.) Finally, Guild asserts Lodi exacerbated contamination in the groundwater by "shutting down or taking out of service certain municipal supply wells for an extended period of time without any remediation ..." (*Id.* ¶ 43.)

### 4. Lodi's Municipal Sewer System

The final basis for liability alleged in Guild's counterclaim is based upon Lodi's

---

**4.** "The City Yard" is a Parks & Recreation Maintenance Yard located at 125 North Stockton Street, in Lodi, California.

municipal sewer system. Guild asserts that Lodi's sewer system contains radial cracks, failing and offset joints, and standing water due to improper construction and inadequate maintenance. (*Id.* ¶ 48.) Based upon these alleged defects, Guild contends Lodi's sewer system released hazardous wastes and substances into the environment. (*Id.* ¶ 49.)

## C. Specific Allegations of RCRA Violations

Count Eight alleges that Lodi is liable under RCRA section 7002(a)(1)(A) because Lodi was an "owner" and "operator" of the four areas described above; namely, the Softball Complex, the City Yard, the water supply system, and the sewer system, which are "facilities" within the meaning of RCRA's regulatory definitions. (*Id.* ¶¶ 126–128.)[5] Based upon alleged improper handling, treatment, storage, and disposal of hazardous waste, including PCE and TCE, Guild asserts that Lodi "was and continues to be [in] violation of RCRA's subchapter III regulations ..." (*Id.* ¶ 132.)

Guild alleges it has standing to assert a RCRA citizen suit because Lodi's violations have contributed to the present soil and groundwater contamination in and under the Lodi. site, including property owned by Guild at 17 South Church Street, in Lodi, California. (*Id.* ¶ 133.) Incorporating language from RCRA, it is further alleged that the contamination may present an imminent and substantial endangerment to the health and environment at Guild's property and will continue to do so until abatement is ordered. (*Id.*) Guild's seeks injunctive relief to require Lodi to "perform at its sole cost any and all required response action that may be neces-

sary to abate the harmful consequences of its RCRA violations." (*Id.* ¶ 134.)

## D. Lodi's Motion for Summary Judgment

Lodi's present motion challenges Count Eight of Guild's counterclaim on three grounds. First, Lodi asserts Guild has discovered no evidence that hazardous waste was present at any of the facilities identified by Guild. (Lodi's Partial Mot. for Summ. Judgment ("Mot.") at 1.) Second, Lodi claims Guild cannot present evidence that Lodi treated, stored, or disposed of a RCRA-defined hazardous waste after November 1980, the date that RCRA's regulations first went into effect. (Mot. at 2.) Finally, Lodi contends Guild's counterclaim fails because "Guild has no expert to provide any opinion about RCRA Subtitle C violations." (*Id.*)

As an initial matter, the court must construe the scope of Lodi's motion because the moving papers are unclear. Lodi's initial brief states that the motion is brought "solely on the issue of" Count Eight of Guild's Counterclaim. (*Id.* at 1.) However, Lodi's argument and evidence focus solely on Guild's allegations concerning the Softball Complex and do not address the broad sweep of Count Eight's allegations, as outlined above, regarding Lodi's water supply system and sewer system.

In its opposition, Guild presents argument and evidence regarding the Softball Complex but does not address the water supply system and sewer system because the liability for those issues, if any, is the subject of other motions presently submitted to the court and, in any event, will be tried in Phase I(a) of the trial. (*See* Opp.

---

**5.** Specifically, Guild cites the definition of "facility" found in 40 C.F.R. § 260.10 claiming that each of the alleged areas are contiguous land, structures, and improvements on the land for treating, storing, or disposing of hazardous waste. (Counterclaim ¶¶ 126–128.)

at 2–3 n. 2.) Guild also opposes Lodi's motion by presenting evidence regarding the City Yard, a topic not addressed in Lodi's initial briefing.

In the reply, Lodi asserts that because Guild did not present evidence regarding Lodi's water supply system or its sewers, summary judgment on that portion of Count Eight must be granted. (Reply at 17–18.) Lodi also, for the first time, improperly raises the issue of whether Guild has standing to assert a claim under RCRA. (*See id.* at 8–9.)

■ The court construes Lodi's motion as a one for summary adjudication of whether Lodi is in violation of RCRA section 7002(a)(1)(A) with respect to Guild's allegations regarding the Softball Complex only. Lodi's argument regarding standing will be deemed waived with respect to Count Eight of Guild's counterclaim because it was not raised in the motion and initial supporting arguments. The court will not address that portion of Count Eight which alleges Lodi is in violation of RCRA section 7002(a)(1)(A) based upon its water supply system, sewer system, and the City Yard activities as none of these operations were the subject of the motion.

## STANDARD

Rule 56 allows a court to grant summary judgment on part of a claim or defense. *See* Fed.R.Civ.P. 56(a) ("A party seeking to recover upon a claim [may move] for a summary judgment in the party's favor upon all or any part thereof."); *see also Allstate Ins. Co. v. Madan,* 889 F.Supp. 374, 378–79 (C.D.Cal.1995). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). One of the principal purposes of the rule is to dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). If the moving party does not bear the burden of proof at trial, he or she may discharge his burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. Once the moving party meets the requirements of Rule 56 by showing there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Genuine factual issues must exist that "can be resolved only by a finder of fact, because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The evidence presented by the parties must be admissible. Fed.R.Civ.P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Falls Riverway Realty, Inc. v. City of Niagara Falls,* 754 F.2d 49,

57 (2d Cir.1985); *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979).

## ANALYSIS[6]

### A. RCRA Section 7002(a)(1)(A)

■ Section 7002(a)(1)(A) of RCRA, 42 U.S.C. § 6972(a)(1)(A), permits citizen suits against any person "who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to [RCRA]." 42 U.S.C. § 6972(a)(1)(A). Any action under section 7002(a)(1) "shall be brought in the district court for the district in which the alleged violation occurred." *Id.*

Where a plaintiff meets its burden of proof, the court may "enforce the permit, standard, regulation, condition, requirement, prohibition, or order referred to in [§ 7002(a)(1)(A)]." 42 U.S.C. § 6972(a).

### B. Application of RCRA Section 7002(a)(1)(A)

#### 1. Presence of a "Hazardous" Waste

■ Lodi asserts Guild cannot produce evidence that hazardous waste was present at the Softball Complex. (Mot. at 14.) Guild responds with "a confluence of circumstances that lead to the irrefutable conclusion that [Lodi] is responsible" for RCRA violations at the Softball Complex. (Opp. at 2.)

Under RCRA, a "hazardous waste" is "a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may (A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5). In addition to the statutory definition of hazardous wastes, "[c]ertain wastes have been listed by the EPA as hazardous pursuant to 40 C.F.R. § 261.30. Alternatively, a waste is considered hazardous if it exhibits any of the characteristics identified in 40 C.F.R. §§ 261.20 through 261.24: ignitability, corrosivity, reactivity, or toxicity." *Connecticut Coastal Fishermen's Assoc. v. Remington Arms Co., Inc.*, 989 F.2d 1305, 1317 (2d Cir.1993).

To demonstrate the presence of a hazardous waste at the Softball Complex, Guild submits the results of sampling taken from the groundwater at the Softball Complex showing elevated levels of PCE and TCE. (*See* Opp. at 9 n. 7.) In a 1996 report prepared by the Northeast Research Institute ("NERI Report") for the DTSC, groundwater sampling at the Softball Complex revealed elevated levels of PCE. (*See* Ex. 22 to Mills Decl. at 33; Lodi's Responses to Guild's Stmt. of Add.

---

6. Lodi requests judicial notice of various documents in the matter of *Odd Fellows Hall Assoc. of Lodi, Inc. v. City of Lodi,* Case No. CIV S–00–1138, including: (1) the court's Memorandum and Order, filed October 2, 2002; (2) Declaration of Thomas A. Smith, filed April 5, 2002; (3) Supplemental Declaration of Thomas A. Smith, filed July 12, 2002; (4) Notice of Filing Deposition Transcripts, filed April 5, 2002; (5) Supplemental Notice of Filing Deposition Transcripts; and (6) Lodi's Request for Judicial Notice, filed April

5, 2002. Judicial notice is appropriate only for facts "not subject to reasonable dispute." Fed.R.Evid. 201. The information contained in each of the requested documents is not appropriate for judicial notice in this matter because they are irrelevant to the issues raised in the present motion and all were originally intended to support Lodi's position in the *Odd Fellows* litigation and, thus, were initially subject to reasonable dispute. Therefore, Lodi's judicial notice requests are DENIED.

Disputed Facts ("Lodi UF"), 27.) In addition, a June 2001 report prepared by the environmental engineering firm Henshaw Associates, Inc. ("Henshaw Report") indicates that groundwater samples at the Softball Complex contained elevated levels of TCE. (*See* Ex. 26 to Mills Decl., Fig. 3–9.) [7] Both PCE and TCE are hazardous substances within the meaning of RCRA. *See* 40 C.F.R. § 261.31.

Guild also proffers the testimony of three former Lodi employees who testified that, on at least one occasion between 1991 or 1992, chemical residues were dumped at the Softball Complex at the direction of their supervisor. (Opp. at 6.) For example, former Lodi employee Bruce Primeau ("Primeau") testified that he was directed by his supervisor Frank Pepper ("Pepper") to dump four or five blue, 55–gallon barrels from Lodi's maintenance yard at the Softball Complex some time in 1991 or 1992. (*See* Depo. of Bruce Primeau ("Primeau Depo."), in Ex. 4 to Decl. of Michael Mills ("Mills Decl."), at 19:19–23; 20:17–24; 21:18.) Primeau stated that some of the barrels he dumped had approximately a foot or less of liquid inside. (Primeau Depo. at 25:3–9.) Primeau was told by his co-worker, former Lodi employee John Falos ("Falos"), that the dumping was to be "top secret." (Primeau Depo. at 21:9–10.)

Similarly, Falos testified that he dumped a 55–gallon barrel on the "dirt area" at the Softball Complex at the direction of Pepper. (*See* Depo. of John Falos ("Falos Depo."), in Ex. 8 to Mills Decl., at 65:9–66–10; *Id.* 66:3–5) ("He either showed us or told us to empty [the barrels] in that dirt area back there by the [railroad] tracks [at the Softball Complex].") Falos remembered some of that which he dumped from the barrel was a "gooey substance" that "looked like a thick syrup." (Falos Depo. 113:8–20.) The record also contains evidence that Lodi's former Parks Director, Ronald Williamson ("Williamson"), saw barrels stored by Lodi at the Softball Complex and he understood that some barrels were washed out there for later use as garbage receptacles. (Depo. of Ronald Williamson ("Williamson Depo."), in Ex. 6 to Mills Decl., at 130:8–14; 132:10.)

Guild's expert Kevin O'Brien opines that "[d]isposal of used 55–gallon drum residues at the City of Lodi Ball Fields (i.e., Softball Complex) has resulted in contamination of groundwater in this area." (Expert Report of Kevin O'Brien, No. 1 ("O'Brien Report"), in Ex. J. to Decl. of Peter Lyon ("Lyon Decl."), at 2.) O'Brien bases his opinion upon evidence that the location of the highest concentrations of TCE were detected in groundwater samples collected in the area of the Softball Complex and those coincided with the location identified by Lodi employees as the site of disposal of residues from used 55–

---

7.  Lodi disputes that the 2001 Henshaw report found elevated TCE in groundwater samples at the Softball Complex. (*See* Lodi's UF 34.) Specifically, Lodi asserts the findings of the Henshaw report are "irrelevant and immaterial to this motion regarding RCRA ... where Guild must prove that treatment, storage or disposal of a RCRA regulated waste occurred after November 1980." (Lodi's UF 34, at 17.) Based upon the court's analysis of an "ongoing violation" under RCRA, *infra,* Lodi's objection is not well taken. Lodi also challenges the Henshaw report by citing to the opinion of its expert, Dr. Anne M. Farr, which does not dispute the *presence* of TCE at the Softball Complex, but she "has opined that evidence demonstrates a source area for the TCE is upgradient from the Softball Complex." (*Id.*) Whether the source of TCE at the Softball Complex was upgradient is triable issue and, in any event, at summary judgment the court must examine all the evidence in the light most favorable to the non-moving party. *Diebold,* 369 U.S. at 655, 82 S.Ct. 993. Thus, the court must accept the finding of the 2001 Henshaw report that TCE levels were found at the Softball Complex in ruling on this motion.

gallon drums. (O'Brien Report at 2.) O'Brien also relies upon the results of six shallow and five deep grab groundwater samples taken by an engineering firm in 1993 through 1994 which revealed high TCE concentrations at the Softball Complex. (*Id.*)

Based upon (1) sampling data from 1996 and 2001, (2) testimony of three former Lodi employees, and (3) the expert opinion of Kevin O'Brien, the court finds that, when viewed in a light most favorable to Guild, the alleged discharge of PCE and TCE by Lodi at the Softball Complex remains a triable issue.

### 2. Quantity of Hazardous Wastes

■ Lodi contends that, even if Guild demonstrates that barrels dumped at the Softball Complex contained PCE or TCE, Guild still must demonstrate "that the barrels in question contained sufficient quantities of hazardous wastes—one inch or more than 3% by weight of the total volume of the container—remained in the drum container before it was emptied and recycled." (Mot. at 14.) As its sole authority, Lodi cites an EPA regulation, 40 C.F.R. § 261.7, which deals with residual waste. *See Crockett v. Uniroyal, Inc.*, 772

F.2d 1524, 1533 (11th Cir.1985). That section provides that an "empty container," [8] is not subject to RCRA regulation if it contains no more than one inch of residue at the bottom of the container or no more than 3 percent by weight of the total capacity of the container. 40 C.F.R. § 261.7(b)(1)(i)-(iii).[9] Containers meeting the regulatory definition of "empty" are not subject to regulation "because no 'empty' containers hold residues that are considered hazardous wastes for regulatory purposes." *Chemtron Corp.*, 2002 WL 31745006 (E.P.A. Dec.2, 2002).

Lodi's reliance upon 40 C.F.R. § 261.7 is misplaced. The testimony of former Lodi employee Falos that he dumped a "gooey substance" that "looked like a thick syrup" [10] from a 55–gallon barrel and the testimony of Primeau, which indicated he dumped barrels with approximately a foot or less of liquid inside,[11] are sufficient to raise a triable issue as to whether barrels dumped by Lodi employees at the Softball Complex qualify as "empty containers" under § 261.7.

■ Aside from this triable issue, Lodi inappropriately attempts to shift the burden of demonstrating an exemption under 40 C.F.R. § 261.7 because, as an alleged

---

8. "Container" is defined as "any portable device in which a material is stored, transported, treated, disposed of, or otherwise handled." 40 C.F.R. § 260.10.

9. 40 C.F.R. § 261.7 provides in relevant part:

Residues of hazardous waste in empty containers.
(a)(1) Any hazardous waste remaining in either (i) an empty container or (ii) an inner liner removed from an empty container . . . is not subject to regulation . . .
. . .
(b)(1) A container . . . is empty if:
(i) All wastes have been removed that can be removed using the practices commonly employed to remove materials from that type of container, e.g., pouring, pumping, and aspirating, and

(ii) No more than 2.5 centimeters (one inch) of residue remain on the bottom of the container or inner liner, or
(iii)(A) No more than 3 percent by weight of the total capacity of the container remains in the container or inner liner if the container is less than or equal to 110 gallons in size, or
(B) No more than 0.3 percent by weight of the total capacity of the container remains in the container or inner liner if the container is greater than 110 gallons in size.
40 C.F.R. § 261.7.

10. (Depo. of John Falos, in Ex. 8 to Mills Decl., at 113:8–20.)

11. (Depo. of Bruce Primeau, in Ex. 4 to Mills Decl., at 25:3–9.)

generator of hazardous waste, Lodi must prove it is entitled to the exemption. *See Ohmstede Machine Works, Inc.,* 1985 WL 57153 (E.P.A. Dec.13, 1985) (Respondent charged with numerous violations of RCRA "must show, in order to fall within the exemption provided by the 'empty container' rule, 40 C.F.R. § 261.7 that the heat exchangers are 'containers,' as that term is defined at § 260.10, and, if they are, that they are 'empty' as defined at § 261.7(b)."). Accordingly, Lodi's argument based upon 40 C.F.R. § 261.7 is without merit.[12]

### 3. Ongoing Violation

■ Lodi contends Guild has presented no evidence that the treatment, storage, or disposal of a hazardous waste resulted from conduct that constitutes an ongoing violation, or occurred after 1980. (Mot. at 2.) Guild asserts that the "remaining discarded hazardous waste" at the Softball Complex constitutes an ongoing violation of RCRA. (Opp. at 9.)

In order to bring a claim under RCRA section 7002(a)(1)(A), there must be an ongoing violation of a RCRA permit, standard, regulation, condition, requirement, prohibition, or order. 42 U.S.C. § 6972(a)(1)(A); *City of Toledo v. Beazer Materials & Servs., Inc.,* 833 F.Supp. 646, 655 (N.D.Ohio 1993).

A number of federal courts have held that the continued presence of hazardous contaminants is sufficient to constitute an ongoing violation in support of a RCRA claim. *See Fallowfield Dev. Corp. v. Strunk,* No. 89–8644, 1990 WL 52745 (E.D.Pa.1990), at *10 ("If a person disposes of hazardous waste on a parcel of property, the hazardous waste remains in that property insidiously infecting the soil and groundwater aquifers. In other words, the violation continues until the proper disposal procedures are put into effect or the hazardous waste is cleaned up."); *Gache v. Town of Harrison, New York,* 813 F.Supp. 1037, 1041 (S.D.N.Y.1993) ("[I]mproperly discharged wastes which continue to exist unremediated represent a continuing violation of RCRA."); *City of Toledo,* 833 F.Supp. at 656 ("[T]he disposal of wastes can constitute a continuing violation so long as no proper disposal procedures are put into effect or as long as the waste has not been cleaned up and the environmental effects remain remediable."); *see also North Carolina Wildlife Fed'n v. Woodbury,* 1989 WL 106517, (E.D.N.C.1989), at *2 (interpreting identical language in the Clean Water Act, 33 U.S.C. § 1365(a), to find: "it is not the physical act of discharging dredge wastes itself that leads to the injury giving rise to citizen standing, but the consequences of the discharge in terms of the lasting environmental degradation.").

For example, in *Gache,* the district court interpreted the meaning of RCRA's section 7002(a)(1)(A) requirement that a defendant be "in violation" of a RCRA regulation or standard. *Gache,* 813 F.Supp. at 1041–43. In *Gache,* plaintiff owned property that had 5.5 acres contaminated by a landfill operated by the Town of Harrison ("Town"). *Id.* at 1039–40. In 1989, the Town closed access to the landfill after plaintiff filed a liability claim against the Town. *Id.*

---

12. Lodi briefly contends that the RCRA counterclaim must fail because Guild's experts do not express opinions "regarding (a) the volume of the alleged release at the ball field, and (b) what was the concentration of any VOCs in the alleged release at the ball field." (Mot. at 18.) As discussed above, the volume and concentration of hazardous waste releases are only relevant to a RCRA claim if the party responsible for the release seeks to demonstrate that its activities fell within the regulatory exemption provided by 40 C.F.R. § 267.1. Because Guild is not required to produce evidence regarding the volume and concentration of Lodi's releases, the court rejects this basis for summary judgment.

The Town moved for summary judgment of plaintiff's claim under RCRA section 7002(a)(1)(A) arguing plaintiff could present no evidence that a continuing violation of RCRA existed from the defunct landfill. *Id.* at 1041. Specifically, the Town asserted that RCRA liability could not attach because all of its dumping activities at the landfill had ceased in 1989, almost a year prior to the filing of plaintiff's lawsuit. *Id.*

The *Gache* court interpreted section 7002(a)(1)(A) to clearly implicate "violations that have already occurred" and concluded that "improperly discharged wastes *which continue to exist unremediated represent* a continuing violation of RCRA." *Id.* (emphasis added). Thus, the *Gache* court stated that "the disposal of wastes can constitute a continuing violation as long as no proper disposal procedures are put into effect or as long as the waste has not been cleaned up and the environmental effects remain remediable." *Id.* at 1042. Based upon this interpretation of RCRA, the *Gache* court found that issues of material fact precluded summary judgment because evidence regarding the landfill's present threat to the surrounding environment was disputed. *Id.* at 1043; *see City of Toledo,* 833 F.Supp. at 656 ("This Court is holding only that the disposal of wastes can constitute a continuing violation as long as no proper disposal procedures are put into effect or as long as the waste has not been cleaned up and the environmental effects remain remediable.")

The present issue is whether Guild has presented sufficient evidence on whether improperly discharged hazardous wastes "continue to exist unremediated" at the Softball Complex. *See Gache,* 813 F.Supp.

at 1041; *City of Toledo,* 833 F.Supp. at 656. As detailed above, the 1996 NERI Report concluded that elevated levels of TCE are present at the Softball Complex and, similarly, the 2001 Henshaw Report found high levels of PCE present. Lodi has presented no evidence that proper disposal procedures have been put into effect or that the hazardous waste has been cleaned up and the environmental effects are no longer remediable.

The evidence submitted by Guild is similar to that analyzed in *State of California ex rel. California Dept. of Toxic Substances v. Campbell,* 319 F.3d 1161 (9th Cir.2003). In *Campbell,* the court of appeals held that circumstantial evidence of TCE contamination on defendant's land was sufficient to raise a triable issue and preclude summary judgment on plaintiff's CERCLA contribution claim. *Campbell,* 319 F.3d at 1166. Despite a state investigation that uncovered no physical evidence that defendant had contributed to the TCE contamination, the Ninth Circuit found triable issues based upon the testimony of the employees of former owners,[13] as well as plaintiff's expert, precluded summary judgment. *Id.*

Specifically, the *Campbell* court cited the following evidence as precluding summary judgment: (1) the testimony of a former employee ("Mr.Holmes") indicating he had dumped TCE-based solvents onto the ground at the property; (2) the testimony of other employees "who did not directly know that TCE had been dumped onto the ground, but whose testimony provided circumstantial corroboration of that fact" because they testified that their former employer had used solvents in parts of its business; and (3) the affidavit of plaintiff's expert which concluded "part of the

---

**13.** Defendant Louisiana–Pacific Corporation ("L–P") owned property that had formerly been owned by Diamond International ("Diamond"). *Campbell,* 319 F.3d at 1164. All

parties agreed that L–P was responsible for any contamination caused by the property when it was owned by Diamond. *Id.* at 1164 n. 2.

TCE contamination must have originated on [defendant's] land." *Id.* at 1164. Although the "physical evidence did call Mr. Holmes's testimony into doubt,"[14] the *Campbell* court nevertheless concluded "it is hard to say a reasonable jury could not conclude that Mr. Holmes was telling the truth," and, coupled with plaintiff's expert testimony, the circumstantial evidence was sufficient to raise a triable issue. *Id.* at 1166.

Like the evidence presented in *Campbell,* the evidence here is circumstantial. It includes the testimony of former Lodi employee, Primeau, who testified that (1) he was directed by his supervisor to dump four or five blue, 55–gallon barrels from Lodi's maintenance yard at the Softball Complex some time in 1991 or 1992,[15] (2) some of the barrels he dumped had approximately a foot or less of liquid inside and, (3) that he was told his dumping was to be "top secret." Primeau's account is corroborated by the testimony of another former Lodi employee who testified that he dumped a 55–gallon barrel on the "dirt area" at the Softball Complex and he remembered some of the contents he dumped from the barrel was a "gooey substance" that "looked like a thick syrup." Finally, Guild's expert Kevin O'Brien found that the high levels of TCE at the Softball Complex coincided with the dumping site identified by Primeau and Falos. He concluded that the disposal of used 55–gallon drum residues at the Softball Complex resulted in contamination of groundwater in that area.

In short, the above circumstantial evidence is comparable to the evidence in *Campbell,* which the court of appeals found sufficient to overcome summary adjudication. Thus, when the evidence proffered herein is viewed in the light most favorable to Guild, there remain triable issues as to whether Lodi discharged PCE and TCE at the Softball Complex, and, whether such substances exist unremediated at that location. Accordingly, Lodi's motion for partial summary judgment must be DENIED.

## CONCLUSION

Based on the above analysis, Lodi's motion for partial summary judgment of Guild's RCRA counterclaim is DENIED.

IT IS SO ORDERED.

---

**14.** Holmes's testimony was called into doubt when "Mr. Holmes showed State investigators where he remembered the open pit [for dumping], and the physical test conducted . . . under state supervision did not find any physical evidence of TCE at that location." *Campbell,* 319 F.3d at 1166.

**15.** The testimony of Primeau and Falos indicates that their dumping activities took place

in 1991 or 1992 which directly contradicts Lodi's assertion that no alleged RCRA violations occurred after November 1980. In addition, the record reflects that Lodi obtained 55–gallon barrels which contained kerosene, motor oil, and gear oil for use at the City Yard from Richfield Oil. (*See* Depo. of Frank Pepper, in Ex. 1 to Mills Decl., at 667:11–69:25; Lodi's Responses to Guild's Stmt. of Add. Disputed Facts, 11.)